ALVA DUNLAP

*v.*

ROBERT ALLEN.

1. CONTRACT—*when not implied, for services.* Where one person goes to reside with another as a member of his family, working only when it suits him, and receives all the attentions due to that relation, without charge for his board and lodging and the care taken of him when in ill or feeble health, he can not, on breaking off his relations, be allowed to charge and recover compensation for every little service rendered.

2. Where two parties understand they are mutually receiving and rendering favors, with no present design to make them pecuniary charges against each other, the relative value of their acts and services becomes immaterial, and neither can recover of the other for those performed by him.

3. Where a person goes to live in the family of another, with the understanding that he is simply to go and come as he pleases and work as he pleases, and be treated and entertained as a member of the family, there is no presumption that he intends to charge for what he does, nor that he is to be charged for what he receives. If he designs to change this relation, he must fully notify the opposite party.

APPEAL from the Circuit Court of Peoria county; the Hon. J. W. COCHRAN, Judge, presiding.

Mr. D. McCulloch, and Mr. John Muckle, for the appellant.

Mr. Chauncey Nye, and Mr. S. D. Puterbaugh, for the appellee.

Mr. Justice Scholfield delivered the opinion of the Court:

This was an action of assumpsit, by Allen against Dunlap, for work and labor.

On the trial below, the jury returned a verdict in favor of Allen, assessing his damages at $637. A *remittitur* being entered by Allen for $107.30 of this amount, the court gave judgment for the residue—$590.70. Dunlap appeals to this court, and asks that this judgment be reversed, on the ground that it is not sustained by the evidence.

A careful examination of the evidence has convinced us that it is our duty to reverse this judgment.

Allen appears to have been an unmarried man, without a home, well skilled in his trade of house carpenter, but in poor health, and much addicted to drunkenness. Dunlap was a farmer, in good circumstances financially, residing on his farm several miles out in the country from the city of Peoria. A mutual friendship and confidence, it seems, was entertained between them, and in January, 1868, Allen went home with Dunlap, and, thenceforward, for several years, Dunlap's house was his home. The services rendered during this time, are the subject of the present litigation.

Allen charges Dunlap with—

| | |
|---|---:|
| 29 days' work, from January 20 to March 1, 1868, $1 per day, - - - - - - - | $29.00 |
| 55 days' work, from March 1 to May 19, 1868, at $2 per day, - - - - - - - | 110.00 |
| 370 days' work, from May 19, 1868, to January 28, 1871, at $2 per day, - - - - - | 740.00 |

55 days' work, from January 28 to April 16, 1871,
at $2 per day,   -   -   -   -   -   -   $110.00

42 days' work, from August 24, 1872, to January 1,
1873, at $2 per day, -   -.   -   -   -   -   84.00

66 days' work, from January 1 to June 1, 1873, at
$2 per day,   -   -   -   -   -   -   -   132.00

Total,   -   -   -   -   -   $1205.00

He admits he has received from Dunlap $207, which should be credited on his account.

From Allen's evidence, alone, but little doubt can be entertained that the first two and the last three items of his account are destitute of merit. As to the first two, he says, "I made no entries in my book prior to May 3, 1868; I calculated five days in the week before that time. If he had settled with me, I did not intend to charge him for that time; would not have charged him if I had left on 1st of March. And again: "During that time," *i. e.* between the 1st of March and 19th of May, 1868, "I made out an account for 55 days' work, which account I made out when I brought this suit. Never made up my mind to charge him with that work till I brought this suit." In his memorandum book, he made, as he says, at the time, this entry, which he intended as the truth: "I, Robert Allen, commenced working for Mr. Alva Dunlap, this date, on house and barn, May 19, 1868."

It is also shown that, during this time, Dunlap furnished boarding, lodging and washing for Allen; and the evidence of Dunlap and others, as to what Allen did during the time, shows that it was but an inadequate compensation for his boarding, lodging and washing.

As to the last three items, Allen says he charged everything up to the 12th of February, 1869. "I left about the middle of February, 1869." After that, he returned from time to time, and worked as occasion required. But he says, "I quit charging him in 1871, but kept on at work."

If he quit charging him then, it was evidently not designed that he should be paid.

Dunlap says, "he (Allen) left us about the 11th of February, 1869, about the time we moved into the house. He came back on the 17th of March; I told him we should not do anything more at the house, except to put up porches; that he might make it his home, but I did not propose to hire him; I never employed him afterwards to work or do anything, or any other arrangement."

That Allen, after this, understood that what he did for Dunlap was only in compensation for board, lodging, etc., is fully shown by other evidence.

Wm. Knight, a brother-in-law of Dunlap, whose deposition is in the record, says, "Allen made his home at Mr. Dunlap's during my last visit there. He said to me that after the close of the war he had no home, and Mr. Dunlap furnished him one. He said he did not expect any pay, and only worked when he felt like it. The conversation I had with him occurred during the months of July, August and September, 1869." He further says that Allen was in the habit of drinking, sometimes to excess. On cross-examination, he says he saw Allen nearly every day for two months, and all the information he had in regard to Allen's position he got from Allen himself.

William Irwin testified that he went to work for Dunlap in May, 1869. Allen told him that, "Dunlap had offered him a home there, and that he should not charge him for what work he did after they got through with the house; that he had been very kind to him and offered him a home, and taken care of him while he was sick, and he should do odd jobs, and they would not cost Dunlap anything." He says, "this conversation took place in 1869; I understood him that he was not to charge anything after the carpenters got through working on the house."

William Dunlap, son of defendant, says, "After the house was finished, Allen worked in the way of odd jobs; he worked

when he felt like it, and there was no time to go by." He told witness he expected to make Dunlap's house his home. " Allen said, ' I go to bed when I want to, and get up when I want to; I am working here, have a home here, and expect to live here, and don't expect to charge anything for my work."

Heywood testified, that, in the spring of 1875, he had a conversation with Allen in which Allen said he had been living with Mr. Dunlap, and working for him, and that he had left him, and that he was not going back any more; he said that he had been working there off and on for four or five years. He also stated that he went there to make it his home, but some little difficulty had occurred. He went there as one of the family. He was to have the use of the shop, as I understood him, and go and do work any place he could get it among the neighbors."

Allen is not shown to occupy a better reputation for truth and veracity than each and all of these witnesses. There is no evidence to impeach any of them, and as to Knight, whose deposition only was before the jury, we have as fair an opportunity of judging as had the jury.

Other evidence shows, that after the completion of Dunlap's house, Allen came and went at his pleasure. When there, he had as good a room as any of the family had, worked, read or idled as he chose, and was, in every way, kindly treated.

As to the third item, that for 370 days' work, from May 19, 1868, to January 28, 1871, for $740, it is claimed Allen is corroborated, in that he sent Dunlap a statement of his time, which Dunlap acknowledged to be correct; and that Dunlap by implication, in recommending Allen to Dr. Lucas as honest and accurate in making charges, so acknowledged to Dr. Lucas. Dunlap denies that he ever acknowleged the correctness of these items, and it appears that what he said to Dr. Lucas was before this statement was presented to him.

In alluding to the last three items charged in Allen's account, we have quoted fully from evidence showing that Allen did not intend to charge for services rendered after the carpenters quit work on the house. The period of that work is shown, beyond controversy, to have commenced about the 1st of June, 1868, and ended about the middle of February, 1869, at the farthest. It is very satisfactorily shown that Allen's work, prior to the 1st of June, 1868, was of but little consequence; but allowing that he commenced the middle of May, four days earlier than he claims to have commenced, and that he continued until the middle of the following February, which is several days after he admits that he quit work, at that time, and we have only nine months time, or, including Sundays as well as working days, 275 days. Allen is shown to have not worked more than five days in the week during that time—sometimes, indeed, to have not worked at all for days or weeks at a time. Thus, Dunlap says "he did no work from the 4th of July to the 18th. * * * After the 4th of July I never knew him to go to town and come home sober except twice."

Hall, a carpenter, who commenced work for Dunlap in August, 1868, and worked there with Allen until in the following February, says: "He did his work well, but was rather slow. He was pretty much all the time complaining that he did not feel very well. He would go off and be gone a day or two along through the time he was at work. He did not appear to be in a situation to work as well after he came back as before he went away. That condition would, perhaps, last a day or two."

Judson Parish, a farm laborer, who worked for Dunlap from the fore part of April till the last of August, 1868, says: "Speaking of Allen, I don't think he was there about the 4th of July. He was absent once or twice in the fore part of July. He was absent one time, I think, about two weeks, and another time a number of days. His indulgence in liquor had the appearance to me of making him feeble, unwell, etc.

8—90 ILL.

He was pretty badly used up when he got back from that spree in July."

Woodcock, a carpenter, also employed by Dunlap, says, his impression is Allen was absent the week after the 4th of July. He also knew of his being absent at different times, a day or so at a time. Saw him working when he was pretty nervous, and knew he had been drinking.

It is impossible, from the evidence, to conclude that Allen's work on the house before he left, in February, 1869, exceeded 175 days, and no one pretends that it was worth more than $2 per day. This, then, leaving out what he acknowledges he received from Dunlap, would leave him entitled to but $350. But a number of witnesses estimate his services at from $1 to $1.50 per day only, and Hall says that Allen told him, while they were at work, " that he had made up his mind to charge him $1.25 a day, since he made that his home, and the old lady had been like a mother to him."

While it appears that Dunlap seemed anxious to have Allen with him, it also appears that Allen was always quite ready to enjoy his hospitality, and that Dunlap and his family, for his occasional work, more than repaid him. He was, many times, a quite serious burden. Dunlap says: " During the month of July, 1870, he was not home sober a single day, and during the month of August it was about the same way. He did not work any. Once in a while he would get on a spree, which would last several days, and sometimes a week or so. Sometimes he pretended to work when he was not fit, from liquor." He was troubled with chronic diarrhœa, which was aggravated by his spells of drunkenness, and at times he required special care in the selection and preparation of food, and attention in the way of nursing.

Dr. Lucas, one of the witnesses first called in chief by Allen, says: "Allen was afflicted with chronic diarrhœa, and complained of other ailments, which, for a time, interfered with his work." He further says: " While working for me, Allen got from one spree to another, pretty fast for a while. * * *

Dunlap or his sons took him out once or twice to sober him up so he could go to work, and kept him a week or ten days." And he gives the result of his experience with Allen thus: "I wouldn't take a man under similar circumstances, and go through what I did for him, for it.   *   *   *   I wouldn't go through the same trouble I had before, and give him his board."

Dunlap is certainly entitled to make no charge for his care of Allen, for it was self-imposed; and, on the other hand, it violates all sense of fairness that Allen, having gone to Dunlap's to reside as a member of his family, and having received the attentions due to that relation, should, on becoming angry, be allowed to turn around, have an estimate placed on every little service rendered, and have judgment therefor.

Where two parties understand they are mutually receiving and rendering favors, with no present design to make them pecuniary charges against each other, it is an unimportant inquiry what is their relative value.   And where an individual goes to live in a family, with the understanding that he is simply to go and come as he pleases, and work as he pleases, and be treated and entertained as a member of the family, there is no presumption that he intends to charge for what he does, nor that he is to be charged for what he receives.   If he designs to change this relation, he must fully notify the opposite party.

The judgment is reversed and the cause remanded.

*Judgment reversed.*