GERTRUDE BRUNNERT, RESPONDENT, v. ESTATE OF FERDINAND BOECK-MANN, DECEASED, APPELLANT.

AND

JOHN BRUNNERT, RESPONDENT, v. ESTATE OF FERDINAND BOECKMANN, DECEASED, APPELLANT.—258 S. W. 768.

Kansas City Court of Appeals. January 21, 1924.

*E. M. Zevely* and *Leslie B. Hutchison* for respondent.

*Glendy B. Arnold* and *Vosholl & Monroe* for appellant.

TRIMBLE, P. J. The controversies herein arose out of two demands filed in the probate court by a husband and his wife, respectively, against the estate of Ferdinand Boeckmann, deceased. By agreement they were tried together as one case in the circuit court, and, upon being appealed, were briefed, argued and submitted as if they constituted but one case. Hence, for convenience and to avoid a repetition of many of the same matters, we will dispose of them in one opinion.

Each demand is in the *form* of an account, beginning March 26, 1905, and continuing uninterruptedly to December 17, 1920, the day Boeckmann died. The wife's account is for "washing, ironing and cooking" from March 26, 1905, to January 1, 1915, and for "cooking" only from the last named date to decedent's death. The husband's account is for "room, board, fuel and light" from March 26, 1905, to January 1, 1917, and for "room, board, fuel, *nursing* and light" from said last named date to the death of decedent. The first item of each account is for the services stated therein from March 26, 1905, to January 1, 1906, and the services rendered in each year thereafter are put down as one separate item at so much per year, the whole amounting in the wife's case to $942 and having no credits in deceased's favor. In the husband's account, the items charged amount to $3579, with a credit thereon "for service rendered by deceased for claimant from March 26, 1905, to December 31, 1917, at $6 per month, $864." Every item of the husband's account includes "board," and every item of the wife's account includes "cooking;" but the instructions, submitting the wife's case, covered "washing and ironing" only. Hence, as the last six items of the wife's account (beginning January 1, 1915, and continuing to the end) were for "cooking" only, she did not recover for any services rendered on or after January 1, 1915. As Boeckmann died December 17, 1920, the last services rendered by the wife, for which she recovered, were performed more than five years prior to decedent's death.

The evidence in support of each demand is, in large measure, the same but wherever there is any difference, or may appear to be any difference, in the evidence offered in support of the two, the same will be hereinafter carefully noted.

The evidence offered in support of the demands tends to show the following facts:

On March 1, 1900, Boeckmann, who was a childless widower then about fifty-five years old, leased his farm for a period of five years

to John Brunnert, one of the claimants herein and lessor's second cousin of the half-blood. Thereupon Brunnert came to the farm, took charge thereof and Boeckmann lived with him. The lease provided that Boeckmann was to have his board free for the first year but was "to do a little work for his board every year thereafter." Shortly after the execution of the lease, Brunnert married and brought his wife (the other claimant), to the farm. The two claimants and deceased were all Germans and uneducated.

At the expiration of the lease Brunnert bought the farm for $4000 of which $2000 was paid in cash. (The other $2000 was paid in small installments through a period of years.) When Brunnert agreed to buy the farm an oral agreement was also made that Boeckmann would leave the farm and reside elsewhere.

But Boeckmann did not move away. He continued to live at the Brunnert home, occupying the separate room he had theretofore occupied, carrying the key thereto, and taking his meals with the family. The Brunnert children were taught to call Boeckmann "Uncle" and they did so, though they used the same term to any stranger in the home, whether boarder or guest, and Mrs. Brunnert used that term when speaking to or of the old gentleman in the presence of the children.

After Brunnert bought the farm he told Boeckman a number of times to look for another home, and the latter said he would go, and he did make inquiries of various persons with reference to room and board and some of these inquires could well be said to be efforts on the part of the old man to obtain lodging and board elsewhere. Nothing came of these efforts. Boeckmann did not secure a place elsewhere and on one occasion when Brunnert told the old man to get a place to stay elsewhere, the old man replied that it was not so easy for him to do. Throughout the time elapsing between the purchase of the farm and the old man's death, claimants repeatedly asked him to leave and on these occasions he would agree to do so but never did. Frequently they would say, in his presence and hearing and perhaps to him, that they "couldn't board anybody for nothing" but to this he would often make no reply, and at other times when the subject was broached, "he got awful mean and we didn't like to have a disturbance in the house," and for this reason the wife says she let him alone, always thinking he would go.

After the expiration of the lease and the purchase of the farm, no express agreement or arrangement was made with Boeckmann that he could stay there, nor was anything said as to what he should pay, and they "never demanded a nickel" of him in payment for the services rendered him though it is conceded he "was a man of means, and had money in the banks." At no time during the period in which Brunnert was paying, in small installments, the

$2000 he owed on the purchase price of the farm, did he ever suggest to Boeckman that a settlement between them be had or that any sum for services rendered should be credited on said indebtedness or that a deduction therefrom he made on that account.

The evidence of claimants further discloses that *during the first ten or twelve years* after Brunnert bought the farm, Boeckmann "shucked corn sometimes, cut a little fire wood, mostly for his own stove, feeding the cattle sometimes," and that *during the later years of his life,* "he did a little work for pasture; shucked sometimes a little corn; burned a little scrubs (shrubs or brush?) or something like that;" that he never worked at Brunnert's direction or under his command or supervision, but only when he felt inclined to do so, and when he didn't feel like it he didn't work.

Claimants' evidence further to the effect that during the last five or six years of decedent's life he was "a sick man," afflicted with a kidney and bladder disease so that he was unable to control his urine, and, in consequence, his clothes and also his bed were at all times saturated therewith, so that an offensive odor was present with him, and, emanating from his room, permeated the house so that the chinks or cracks in his room had to be stuffed with rags in an effort to keep the smell out of the rest of the house.

At no time during the years the old man lived with claimants did either of them ever specifically ask the old man to pay his board or tell him he was being charged therefor, nor did either of them ever *expressly* tell him that they were intending to charge him or were expecting that he would eventually pay for the services he was receiving. Neither of the claimants kept any memorandum or written record or account of the charges contained in their respective demands. Both of the accounts in said demands were made up from memory alone after Boeckmann's death.

At the opening of the trial, defendant interposed the five-year Statute of Limitations against each demand; and at the close of the whole evidence, defendant offered demurrers to the evidence, but these were overruled. Defendant then invoked the five-year Statute of Limitations against each demand by praying instructions telling the jury, in effect, that any services rendered more than five years prior to decedent's death were barred by said Statute of Limitations. These were also overruled, and the case was sent to the jury. Two verdicts were returned, one in John Brunnert's favor for $1400, and the other in favor of Mrs. Brunnert for $900. Judgments being rendered in these, the defendant appealed.

We will first consider John Brunnert's demand.

It is true that, in the sense of close blood kinship and a moral obligation or kindly desire on that account to support and care for deceased, a family relationship did not exist between claimant and

deceased. But that is not the sense, or at least is not always the sense, in which the phrase is used in determining whether a claimant is or is not entitled to pay for services in cases where the question of family relationship arises. If two persons live together in the same household, concurrently rendering services to each other and each accepting services from the other, then in the absence of an express contract that payment is to be made *in addition* to the benefit derived from the arrangement or relationship under which they are living, the law presumes such benefit to be the full recompense to each for the services rendered and that neither intended to charge or to accept pay for the services he rendered, and the relative pecuniary value of the services rendered by each is not material. [Davis v. Davis, 9 Car. & P. 87; Ryan v. Lynch, 9 Mo. App. 18; Dunlap v. Allen, 90 Ill. 108; Williams v. Hutchinson, 3 N. Y. 312; Riley v. Riley, 38 W. Va. 283; 11 L. R. A. (N. S.) 873, note.] At any rate before either of such parties, thus living together, can recover for services rendered there should be evidence of facts implying that both parties understood that such payment was to be made. It would seem that, at least during the period when decedent was rendering services to John Brennert on the farm, the relations between these two were such that, while it did not constitute a family relationship in the ordinary sense of that term, yet the situation was such as that Boeckmann could reasonably think he was rendering compensation for his board and lodging, and that so long as that continued, the situation would have the same result or create the same status as where a family relationship existed. And this being so, it was incumbent upon Brunnert to prove that a change in the situation was made whereby the old man would know that Brunnert intended to charge, and decedent was expected to pay and knew or should have understood that payment was to be made. [Weaver v. Wilson, 206 S. W. 916.] The last four years of the lease the decedent was "to do a little work for his board every year." And while this would indicate that no family relationship existed in the usual and ordinary sense of that term, i. e., that the old man was being *gratuitously* supported as a relative or member of Brunnert's family, yet, so long as the rendition of reciprocal services continued, without change, it would afford grounds for the old man to suppose that his services to Brunnert were in return for his board. It is true that upon Brunnert's purchase of the farm, Boeckmann agreed to go away. However, he didn't go; he remained and continued to render services as before. It also is true that Brunnert, at various times, told him to go and that he couldn't afford to board anybody for nothing, but he allowed Boeckmann to stay and continued to accept the services the latter rendered without once telling him that the former arrangement was abrogated, or that he was going to

charge him for what he was getting, and did not make or have any arrangement or understanding with him in regard to either what Boeckmann's services were worth or what he (Brunnert) was to have for the service he rendered Boeckmann or that Brunnert was to have any additional compensation. In making payments on the $2000 debt he owed Boeckmann, Brunnert never asked for, or intimated that he was entitled to, credit for anything in the way of board or lodging furnished. What he said to Boeckmann at different times amounted to nothing more than *complaints* and *objections* to the existing state of affairs, but he allowed that state of affairs to continue and allowed Boeckmann to render services to him which, in his account, he values at $864. But there was neither an express nor an implied *agreement* between himself and Boeckmann as to what those services were worth nor what the board furnished was worth except that perhaps there was an implication that the respective services equalled each other. By the credit Brunnert has given in his account, he admits that deceased was entitled to compensation from him for the services rendered during those years. Such compensation, of course, in the absence of any agreed price, must be reasonable compensation; and by giving such credit, claimant admits that deceased intended to charge and expected to receive reasonable compensation. So long as the two continued to render services to each other, with no agreement or understanding otherwise, the presumption would be that the respective services of each fully compensated the other. Under such circumstances, how can it be said that the law will raise a presumption that deceased intended to pay Brunnert any *additional* compensation for what he obtained in the way of board and lodging? In other words, as to compensation claimed to be yet due John Brunnert for board and lodging furnished under such circumstances, there is no evidence that at any time during the period the reciprocal services were being furnished, the said claimant intended to charge, or that Boeckmann expected to pay, any such additional compensation. Hence the former cannot recover for any board and lodging furnished for the time during which decedent was rendering services to him. [Hyde v. Honiter, 175 Mo. App. 583, 592; Wood v. Lewis, 183 Mo. App. 553, 563.] The situation in this case is peculiar and renders it somewhat different from the ordinary case. Apparently, the relationship between them was such that one was getting his board and lodging for the services he rendered the other, that is, the compensation of each offset that of the other, and so long as the mutual furnishing of these services continued, with no agreement or arrangement to the contrary, that situation would continue, and no showing is made from which it can be found that during that time any change was actually made or that this claimant intended to charge, and the decedent *intended to pay an ad-*

ditional amount for board and lodging. But the situation would be changed the moment Boeckmann became unable to render services on his part. When he ceased to do that, then clearly he could no longer expect to receive board and lodging without paying therefor; and, in receiving board and lodging under these circumstances, there being no other kind of relationship existing between them whereby he could expect to get board and lodging free of charge, then the law will imply a promise on his part to pay for such board and lodging received after that, and the same is true as to *nursing* for that is rendered under the same circumstances and it is also wholly outside of any arrangement whereby services were rendered for board and lodging. For these reasons we think that the relations existing between Brunnert and Boeckmann were such that while the former could not recover for board and lodging for the time during which Boeckmann was able to and did render services to Brunnert, in the absence of any agreement or mutual understanding to the contrary, yet there was no such family relationship as forbids recovery for the things last above indicated. Of course, if, at the time these things thus limited were furnished, Brunnert had no intention of charging for them, he cannot afterwards decide to do so and recover. Under the circumstances, however, we cannot say that conclusively he had no such intention. That is a question for the jury to pass upon. The services now under consideration may have been, and seem to have been, rendered after he had paid the $2000 indebtedness. However, even if a few of these payments may have been made before the old man entirely ceased to render services on the farm (and claimant's account does not concede any after December 31, 1917), still we are not prepared to say that such payments without asking for or obtaining any credit for board or nursing *conclusively* show that no intention to charge therefor existed. As Judge SHERWOOD said in Sidway v. Missouri, etc., Co., 163 Mo. l. c. 385, on the first appeal thereof (quoted on the second appeal in 187 Mo. 662), it is ''pregnant evidence,'' i. e., evidence carrying great weight, that he did not intend to charge. But evidence having great weight is not *conclusive* evidence, especially in view of Brunnert's oft repeated statements to decedent that he could not afford to board anybody for nothing. In the Sidway case it was not merely the failure to present a bill for services, but the fact that claimant said *in writing* he was not making any charge, that was held to conclusively bind him.

But if any of these last mentioned services were rendered more than five years prior to the death of decedent, no recovery can be had for such because they are barred under section 1317, Revised Statutes 1919. There is nothing to show that the account is an ''open running account'' for there is no evidence from which it can

be said "that the conduct of the parties makes it fairly inferable that it was their intention to have a future adjustment." [Poague v. Mallory, 208 Mo. App. 395, 400-401; Earls v. Earls, 182 S. W. 1018, 1020.] Hence such of said services as were rendered more than five years prior to decedent's death are barred. This, of course, likewise, applies to such of the other services hereinbefore considered as were rendered more than five years prior to defendant's death and is an additional reason why they cannot be recovered. We are unable to tell from the record just when any change in the situation occurred so as to enable us to separate the recoverable from the nonrecoverable items, and hence we could not well place the denial of recovery for the services first hereinabove considered solely on the ground that they were barred.

The judgment in favor of John Brunnert is therefore reversed, and, as to him, the cause is remanded for a new trial involving only the items for which recovery is herein permitted.

With reference to the wife's demand, however, the case seems to stand upon a different footing. In the first place, the services for which she recovered were "washing and ironing," and these are not usually considered a part of one's board and lodging. In the next place, there is nothing in the way of services rendered by Boeckmann to her which could in any way induce him to believe that he was rendering her compensation in return for what she was doing for him. We cannot say, as a matter of law, that the washing and ironing she did for him was done by her as a housewife for her husband or as a part of the latter's services rendered to the old man. The evidence is that she kept boarders and retained for herself the money thus made. Neither should it be said, as a matter of law, that a family relationship existed between her and decedent so as to prevent her recovery. Neither can we say that, conclusively, she did not intend to charge for her services. The evidence, if believed, is such that the jury could find that there was no family relationship and that she intended to charge and that Boeckmann, as a reasonable man, must have known that he was expected to pay her, and in that situation unless there was a family relationship the law will imply that he intended to pay her. He knew he was not rendering her any service and from his conversation with her, the jury could well find that he knew she was not rendering him service for nothing or as a member of the family. When she would mention the subject to him he would get ugly about it; and he told one witness that Mrs. Brunnert did not want him there and he would have to go away. We do not understand that one can avail himself of the services of another, knowing that he has no claims on such other for free services and knowing that the other is not rendering the services for nothing, and yet secretly not intend to pay for them and in that way

avoid payment. In such case the law will imply a promise to pay on his part, and recovery therefor can be had unless barred by limitation. [Fitzpatrick v. Dooley, 112 Mo. App. 165; Bowman v. Shelton, 175 Mo. 696; Kingston v. Roberts, 175 Mo. App. 69, 77.] There was evidence from which the jury could find that Boeckmann understood, or as a reasonable man should have understood, that payment was to be made. [Dobbin v. Dobbin, 204 S. W. 918; Weaver v. Wilson, 206 S. W. 916.] It does not have to be shown by direct testimony that he did so understand, such may be shown by the circumstances. [Mabary v. Mabary, 173 Mo. App. 437, 447; Allen v. Allen, 101 Mo. App. 676, 683.]

All of the services rendered by the wife were performed more than five years before decedent's death. Is she barred by section 1317, Revised Statutes 1919, the five-year Statute of Limitation? She is, unless she comes within the exception granted to married women in section 1323 of the same article of the statute which provides that—

"If any person entitled to bring an action in this article (art. 9) specified, at the time the cause of action accrued, be either . . . or a married woman, such persons shall be at liberty to bring such actions within the respective times in this article limited after such disability is removed."

In Throckmorton v. Pence, 121 Mo. 50, and in Lindell Real Estate Co. v. Lindell, 142 Mo. 61, 75, 76, the Supreme Court held that sections 1996 and 6864, Revised Statutes 1889 (the former has been dropped from the statute and the latter is now section 7323, Revised Statutes 1919), giving to a married woman the right to sue and be sued without joining her husband, did not change or operate to repeal by implication section 6767, Revised Statutes 1889, which exempted a married woman from the ten-year Statute of Limitation as to real actions; that mere ability to sue does not impose an obligation to do so and where a married woman can sue either with or without her husband, failure to do so will not subject her to a plea of the Statute of Limitations.

Defendant urges that section 1323, Revised Statutes 1919, confers upon a married woman merely the privilege, if she chooses to avail herself of it, of bringing her action within the statutory period after she has become discovert, but that to avail herself of such privilege, she must *not* sue while still covert but must wait until she has become discovert, and as she sued while still under coverture she did not choose to come within section 1323, and, not being within its exception, she is barred by section 1317. In other words, if a married woman waits until her husband dies, she is not barred, but, having sued after five years but while still a married woman, she is barred. We cannot accept such construction of the statute. It is true section 6767, Revised Statutes 1889, contained the clause that

"the time during which such disability shall continue shall not be deemed any portion of the time in this article limited for the commencement of this action" while no such clause was in section 6779, Revised Statutes 1889 (now section 1323, Revised Statutes 1919). But this does not affect the rule adopted by the Supreme Court. In the Lindell case (142 Mo. l. c. 77) the court, quoting Wood on Limitations with approval, says: "the circumstance that the Legislature has clothed them (married women) with these rights (exemption from limitation statutes), without making any change in the Statute of Limitation with regard to them, indicates an intention on the part of the Legislature that they shall still remain within the exception therein contained." It was no doubt because of these decisions that the Legislature in 1917 repealed section 1881, Revised Statutes 1909 (then the same as section 6767, Revised Statutes 1889), and enacted what is now section 1307, Revised Statutes 1919, and omitted married women entirely (Laws 1917, p. 205), and afterwards in 1919 (Laws 1919, p. 496), also enacted section 1308, Revised Statutes 1919, giving married women, in all cases where her rights accrued thereafter ten years in which to bring an action for realty and providing a certain time after the enactment of the statute in which to bring an action upon rights which had theretofore accrued. In other words, as to real actions, the Legislature now requires married women to sue within the same time as others are required to do in real actions. The Legislature, however, made no change in section 1323 but left it as it had been. Applying the principle contained in the above quoted excerpt from the Lindell case, as the Legislature have not seen fit to take married women out of the exemption given in section 1323, it would seem that, unless the terms of said section requires the construction insisted upon by defendant, we must hold that plaintiff is exempt from the limitation in section 1317, even though she has not waited until she has become discovert but has brought her suit while still a married women. This is in accord with the principle announced in the Lindell case that mere ability to sue does not impose an obligation to do so, and where a married woman can sue, either with or without her husband, failure to do so will not subject her to a plea of the Statute of Limitations. That this applies also to section 1323 is apparent from the general language used. Furthermore, Judge GRAVES, in his dissenting opinion in Powell v. Bowen, 279 Mo. 298, 300-301, although severely and powerfully criticising the rule adopted by the Supreme Court, clearly indicates that the rule applies to section 1323 for he includes that section (as section 1894, Revised Statutes 1909) along with section 6767, Revised Statutes 1889 (then section 1881, Revised Statutes 1909), and says that to hold (as he thinks is should be held) that the Married Women's Act of 1889 (section

7323, Revised Statutes 1919) struck the exemption from one limitation statute would have the affect to also strike the similar limitation from the other. Section 1323 does not say that a married woman must wait until she is discovert before being entitled to the benefit of that statute. It merely gives her the liberty of suing at any time within five years after her disability is removed. (Section 6767, Revised Statutes 1889, used the same language except that she was allowed three instead of five years.) The effect of section 1323 is to exempt her from the five-year limitation of section 1317 and is, for her, a Statute of Limitation which will not bar her until five years after her husband's death; and section 7323 gives her the right to sue while she is still a married woman without affecting the Statute of Limitation as to her. Under the rule adhered to by the Supreme Court, we hold that plaintiff is not barred. In some of the cases announcing, the rule adopted and followed by the Supreme Court, the plaintiffs were still married women, and yet they were held to be exempt from the Statute of Limitation.

Instruction No. 5, submitting Mrs. Brunnert's claim, omits to require the jury to find that at the time the services were rendered, she intended to charge and decedent understood, or under all the facts and circumstances should have understood, that compensation was to be made. This omission rendered the instruction erroneous. [Wood v. Lewis, 183 Mo. App. 553, 568; Sidway v. Missouri, etc., Co., 187 Mo. 649, 663.] The fact that the instruction, towards the latter end thereof, tells the jury that they cannot find the issues for her if a family relationship existed, does not, in our view, cure the omission of requiring the jury to find that she intended to charge, for under the peculiar facts of this case she may not have intended to charge, even if, as between her and him, there was no family relationship.

For this reason the judgment in her favor must also be reversed and the case remanded for a new trial. It is so ordered. All concur.