Margaret Ann **JOHNSTON,**
**Plaintiff-Appellant,**

v.

**ESTATE OF Holland K. PHILLIPS,**
**Deceased, Edwin Phillips, Executor,**
**Defendant-Respondent.**

No. 14149.

Missouri Court of Appeals,
Southern District,
Division One.

March 6, 1986.

Theodore G. Scott, Buffalo, for plaintiff-appellant.

Don W. Owensby, Warren S. Stafford, Taylor, Stafford & Woody, Springfield, for defendant-respondent.

FLANIGAN, Judge.

Claimant Margaret A. Johnston appeals from an order of the Probate Division of the Circuit Court of Dallas County disallowing her claim against the estate of Holland K. Phillips, deceased. The claim sought $48,000 for services claimant rendered Phillips during his lifetime. The appeal is from the probate division to this court as authorized by § 472.160.[1]

Phillips died on January 10, 1983, at the age of 75. The claim was resisted by his

1. All references to statutes are to RSMo 1978, V.A.M.S.

executor. Both sides introduced testimony at the hearing on the claim. Sitting without a jury, the trial court, in its order, made no findings of fact nor was it requested to do so.

Margaret's sole contention on appeal is that the trial court erred in disallowing her claim "in that all of the evidence clearly demonstrated" that she provided valuable services "under circumstances rendering it unjust to deny her compensation therefor."

The claim was in two counts. Count 1 sought recovery on an express contract, based upon an alleged conversation in 1971 between Phillips and Margaret. Although Margaret began to testify in the trial court, objections based on the "Dead Man's Statute" served to limit her testimony and she does not contend, on this appeal, that she made a sufficient showing to justify recovery on Count 1.

Count 2 was based, so it alleged, "upon the doctrine of quantum meruit." Margaret's brief states, "The gravamen of appellant's claim in this case rests upon a theory of implied contract, or quantum meruit, relating to sundry domestic services performed by appellant for Holland Phillips during the years immediately preceding his death."

Appellate review of this court-tried case is governed by the standard set in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). See *In re Estate of Miles*, 632 S.W.2d 323, 325[1] (Mo.App.1982); *Matter of Estate of Enger*, 616 S.W.2d 137, 138[3] (Mo.App. 1981). This court must affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law.

Count 2 sought recovery of $48,000, representing the alleged reasonable value of the services rendered by Margaret. She produced several witnesses who testified that the reasonable value was $200 a week. It appears, therefore, that the claim is based primarily upon services rendered during the last four or five years of Phillips' life. Indeed Margaret's brief emphasizes the value of her services during 1980, 1981 and 1982.

Phillips lived in Buffalo, Missouri, where for years he had operated a tire business. He also owned a farm near Buffalo. Some time in the 1960s Phillips turned over the active management of the tire business to his son. In 1969 Phillips bought the Happy Hill Tavern near Buffalo. Apparently the tavern was operated by someone else until 1972 when Phillips himself "started running it." Phillips sold the tavern in 1977. Margaret's brief states, "Appellant apparently commenced her acquaintance with Phillips as an employee in the tavern and resided in an adjacent house. At some point appellant and Phillips began living together, although the exact date is unclear."

There was no evidence concerning whether Margaret was paid for her services as an employee in the tavern and she makes no claim for such services. There was evidence that she and Phillips spent nights together at her house or his before she moved in with him.

Evidence from both sides showed that Margaret lived with Phillips in his house in Buffalo, commencing at least as early as 1979, until his death. One of Margaret's witnesses testified that "Margaret stayed with Phillips a long time beginning in 1968 or 1969." A neighbor testified that Margaret and Phillips lived together for five or six years.

Phillips' health was good until shortly before his death. Two months before he died he went on an eight-day deer hunting trip which involved "stomping through the woods." He did not require nursing.

One of Margaret's witnesses testified that "it was common knowledge around Buffalo that Margaret and Phillips were living together." Margaret's son testified that the couple "lived together in that house for a number of years before he died." There was testimony that, prior to the time Margaret moved into Phillips' house, they made trips together to Mexico and Iowa. On those trips "they slept together."

Testimony from both sides showed a very close relationship between Margaret and Phillips. Phillips' daughter-in-law testified that "they shared the same bedroom, they went places together, they went fishing, they went to funerals together." Margaret's son, testifying for his mother, said, "They would go out in public together. I don't know if you would say that they lived together as husband and wife." Lona White, testifying for Margaret, said that Phillips and Margaret "were together" for ten years. Elbert White, a witness for Margaret, testified, "I assume Phillips and Margaret lived together as husband and wife."

There was evidence that Margaret and Phillips played cards together, and had guests in to play cards. Margaret and Phillips also entertained friends for dinner and "ate at the same table." One witness testified, "After 1979 I have been in their home to visit and eat. Margaret cooked and put the meals on the table and then we would all sit down and eat like a family."

With respect to the services rendered by Margaret, and the benefits conferred upon her by Phillips, there was little dispute. Phillips furnished Margaret with transportation and with "a nice home." Margaret did the yard work, cooked, washed and kept house. Plaintiff offered testimony showing that Margaret also worked on the farm, where they did not live, but some defense witnesses stated that Margaret did no work at the farm. A defense witness testified that Phillips paid the bills and Margaret did the work at the house where they lived together.

Elbert White, Margaret's witness, testified that "Margaret carried on the duties of a housewife for a husband." Margaret's witness Virgen testified that Margaret "waited on Phillips just like any wife would" and that Phillips furnished Margaret with "a nice home and transportation." Margaret had no furniture of her own. There was testimony that Phillips paid the household expenses, including groceries, utilities and telephone. A witness for Margaret testified that Phillips "worked hard right up until he died."

Margaret offered testimony of various statements which Phillips allegedly made to individual witnesses. The statements included: "I have got my papers all fixed up. Margaret will be taken care of.... If something happens to me Margaret will be taken care of.... I have provided for Margaret when I am gone." The defense offered testimony from Phillips' brother to the effect that "Phillips never mentioned that he was going to pay Margaret or take care of her." Another defense witness, a close friend of Phillips, testified: "Phillips paid the bills and Margaret did the work. Phillips never mentioned any arrangements."

The record is clear that for several years prior to his death Phillips and Margaret conducted their joint household in the same manner as if they were married. Such a relationship, even in the absence of sexual relations, gave rise to a "family relation" between Margaret and Phillips. *Wells v. Goff,* 239 S.W.2d 301 (Mo.1951); *Manning v. Driscoll's Estate,* 174 S.W.2d 921 (Mo. App.1943). In each of those cases a woman filed a claim against the estate of a male decedent for general housework performed for him during his lifetime. In each case, a "family relation" was found to exist.

In *Wells* the couple lived together over 20 years, although the court said there may have been no "illicit cohabitation." There was *no express contract* concerning compensation and the claimant did not assert that a "contract implied in fact" was "a fair inference from all the circumstances." The existence of the "family relation" under those circumstances was fatal to the claim.

In *Manning* the couple resided in the same house for 13 years. The court found a family relation existed, although "the only inference that could be drawn from the evidence is that he and she occupied a platonic relationship for their mutual comfort and convenience." The existence of the family relation and the failure of the claimant to show "any contract for pay,

either express or implied," was fatal to the claim.

In *Manning* the court quoted language from *Brunnert v. Boeckmann's Estate*, 258 S.W. 768, 770 (Mo.App.1924), and said it was "peculiarly applicable here." The quoted language reads:

"It is true that, in the sense of close blood kinship and a moral obligation or kindly desire on that account to support and care for deceased, a family relationship did not exist between claimant and deceased. But that is not the sense, or at least is not always the sense, in which the phrase is used in determining whether a claimant is or is not entitled to pay for services in cases where the question of family relationship arises. If two persons live together in the same household, concurrently rendering services to each other, and each accepting services from the other, then, in the absence of an *express* contract that payment is to be made in addition to the benefit derived from the arrangement or relationship under which they are living, the law presumes such benefit to be the full recompense to each for the services rendered, and that neither intended to charge or to accept pay for the services he rendered, and the relative pecuniary value of the services rendered by each is not material." (Emphasis added.)

That language from *Brunnert* was also cited with approval in *Roller v. Montgomery's Estate*, 45 S.W.2d 945, 948 (Mo.App. 1932), and in *Thomas v. Fitzgerald's Estate*, 297 S.W. 425, 429 (Mo.App.1927).

The only reasonable inference to be drawn from the evidence is that a family relation existed between Margaret and Phillips, beginning at least as early as 1979, and probably before, and that the relation continued to exist throughout the three years (1980, 1981 and 1982) which appellant emphasizes and indeed until Phillips' death.

"Where a family relation exists between a person rendering services and the recipient thereof ... the rule followed in this state is that no promise or

agreement that the services are to be paid for is implied from the mere fact that the services have been performed and accepted. Prima facie, the presumption is that such services are rendered gratuitously, casting upon the party claiming compensation therefor the burden of rebutting the presumption. In overcoming the presumption, a claimant must prove either by direct evidence or by evidence from which it may be reasonably inferred that there was an agreement or mutual understanding the claimant was to be remunerated for the services rendered. While mere expressions of gratitude or intended generosity on the part of the recipient are not alone sufficient, a promise to pay may be implied from any facts or circumstances which in their nature reasonably justify the inference of an actual contract of hire or an actual understanding between the parties to that effect."

*McDaniel v. McDaniel*, 305 S.W.2d 461, 464[1, 2] (Mo.banc 1957).

No Missouri case has been found in which the existence of a meretricious relationship was itself held to be a sufficient reason to deny a claim for housewifely services. In *Higgins v. Breen*, 9 Mo. 497 (1845), claimant innocently went through a marriage ceremony with a man who falsely represented himself to be a widower. In fact he had a living wife, and the "marriage" to claimant was void. The supreme court held that the claimant was not entitled to dower since she was not in fact a widow but that she could recover from the estate of her putative spouse for housekeeping services.

Courts in other states, in earlier days, denied claims for services by "live-in" paramours, at least where recovery was sought on the basis of an implied contract. *Usalatz v. Pleshe's Estate*, 302 Ill.App. 392, 23 N.E.2d 939 (1939); *Williams v. Payne*, 515 S.W.2d 618 (Ky.1974); *In re Gorden's Estate*, 8 N.Y.2d 71, 202 N.Y.S.2d 1, 168 N.E.2d 239 (1960); *Willis v. Willis*, 48 Wyo. 403, 49 P.2d 670 (1935); 98 C.J.S. Work and Labor § 25, p. 755; 66 Am.

Jur.2d Rest. & Imp.Con. § 54, p. 1000; Williston on Contracts, 3d Ed (1972), § 1745.

More recent authorities dealing with claims for services by an unmarried cohabitant include *Mason v. Rostad,* 476 A.2d 662 (D.C.App.1984); *Roznowski v. Bozyk,* 73 Mich.App. 405, 251 N.W.2d 606 (1977); *Tapley v. Tapley,* 122 N.H. 727, 449 A.2d 1218 (1982); and *Morone v. Morone,* 50 N.Y.2d 481, 429 N.Y.S.2d 592, 413 N.E.2d 1154 (1980); 94 A.L.R.3d 552 (recovery for services rendered by persons living in apparent relation of husband and wife without express agreement for compensation).

In *Mason* a contractor successfully sued his mistress for the value of his services in remodeling her house. In *Roznowski* the court held that the claimant could recover for services of a commercial variety rendered to her cohabitant if she established a "contract implied in fact," but that claimant could not recover on the basis of quantum meruit. In *Tapley* the court refused to permit recovery on a theory of quantum meruit where the claimant rendered housewifely services to her cohabitant.

In *Morone* the court pointed out that changing social custom has increased greatly the number of unmarried persons living together. Although the court conceded that an express contract for compensation would be enforceable, at least so long as illicit sexual relations were not part of the consideration of the contract, the law would not imply a contract from the mere rendition and acceptance of services. 429 N.Y.S.2d at p. 596, 413 N.E.2d at p. 1157 the court said:

> "The major difficulty with implying a contract from the rendition of services for one another by persons living together is that it is not reasonable to infer an agreement to pay for the services rendered when the relationship of the parties makes it natural that the services were rendered gratuitously.... As a matter of human experience personal services will frequently be rendered by two people living together because they value each other's company or because they find it a convenient or rewarding thing to do.... For courts to attempt through hindsight to sort out the intentions of the parties and affix jural significance to conduct carried out within an essentially private and generally noncontractual relationship runs too great a risk of error. Absent an express agreement, there is no frame of reference against which to compare the testimony presented and the character of the evidence that can be presented becomes more evanescent. There is, therefore, substantially greater risk of emotion-laden afterthought, not to mention fraud, in attempting to ascertain by implication what services, if any, were rendered gratuitously and what compensation, if any, the parties intended to be paid." (Authorities omitted.)

The court stated that its holding was consistent with the statutory abolition of common law marriages in New York. Section 451.040(5) is the Missouri counterpart of that statute.

■ It was incumbent upon Margaret to prove by direct or circumstantial evidence that there was an agreement or mutual understanding that she was to be paid for the services rendered. In the absence of proof of an express contract, she had to adduce evidence from which the court could infer "an actual contract of hire or an actual understanding between the parties" that she was to be paid. The mere rendition of the services, admittedly valuable, did not justify allowance of the claim.

■ Although some of Margaret's witnesses attributed certain statements to the decedent, it is arguable that they were mere expressions of "intended generosity" if in fact they were made at all. The trial court had the right to disbelieve that testimony or, if believed, to regard it as falling short of proof of "an actual contract of hire." There was no evidence of any statements made by Phillips to Margaret or in her presence concerning payment.

The arrangement between Margaret and Phillips was one from which each derived benefits. The trial court reasonably could

have found, and apparently did find, that there was no "agreement or mutual understanding the claimant was to be remunerated for the services rendered." *McDaniel v. McDaniel,* supra.

This court holds that the order of disallowance is not against the weight of the evidence, that it in fact is supported by substantial evidence and that the trial court did not erroneously declare or apply the law.

The judgment is affirmed.

TITUS, P.J., and GREENE, J. concur.