OPINION OF THE COURT
Meyer, J.
Presented by this appeal are the questions whether a contract as to earnings and assets may be implied in fact from the relationship of an unmarried couple living together and whether an express contract of such a couple on those subjects is enforceable. Finding an implied contract such as was recognized in Marvin v Marvin (18 Cal 3d 660) to be conceptually so amorphous as practically to defy equitable enforcement, and inconsistent with the legislative policy enunciated in 1933 when common-law marriages were abolished in New York, we decline to follow the Marvin lead. Consistent with our decision in Matter of Gorden (8 NY2d 71), however, we conclude that the express contract of such a couple is enforceable. Accordingly, the order of the Appellate Division dismissing the complaint should be modified to dismiss only the first (implied contract) cause of action and as so modified should be affirmed, with costs to plaintiff.
On a motion to dismiss a complaint we accept the facts alleged as true (219 Broadway Corp. v Alexander’s Inc., 46 NY2d 506, 509) and determine simply whether the facts alleged fit within any cognizable legal theory (see Rovello v Orofino Realty, 40 NY2d 633).
Plaintiff alleges that she and defendant have lived together and held themselves out to the community as husband and wife since 1952 and that defendant acknowledges that the two children born of the relationship are his. Her first cause of action alleges the existence of this long-continued relationship and that since its inception she has performed domestic duties and business services at the request of defendant with the expectation that she would receive full compensation for them, and that defendant has always accepted her services *485 knowing that she expected compensation for them. Plaintiff suggests that defendant has recognized that their economic fortunes are united, for she alleges that they have filed joint tax returns "over the past several years.” She seeks judgment in the amount of $250,000.
The second cause of action begins with the repetition and reallegation of all of the allegations of the first cause of action. Plaintiff then alleges that in 1952 she and the defendant entered into a partnership agreement by which they orally agreed that she would furnish domestic services[1] and defendant was to have full charge of business transactions, that defendant "would support, maintain and provide for plaintiff in accordance with his earning capacity and that defendant further agreed on his part to take care of the plaintiff and do right by her,” and that the net profits from the partnership were to be used for and applied to the equal benefit of plaintiff and defendant. Plaintiff avers that defendant commanded that she not obtain employment or he would leave her, and that since 1952 the defendant has collected large sums of money "from various companies and business dealings.” Finally, plaintiff states that since December of 1975 defendant has dishonored the agreement, has failed to provide support or maintenance, and has refused her demands for an accounting. She asks that defendant be directed to account for moneys received by him during the partnership.
Special Term dismissed the complaint, concluding that no matter how liberally it was construed it sought recovery for "housewifely” duties within a marital-type arrangement for which no recovery could be had. The Appellate Division affirmed because the first cause of action did not assert an express agreement and the second cause of action, though asserting an express partnership agreement, was based upon the same arrangement which was alleged in the first cause of action and was therefore "contextually inadequate”. The dissenting Justice was of the view that while the first cause of action was legally insufficient as premised upon an implied contract, the second, expressing as it does an explicit agreement, should have been sustained.
Development of legal rules governing unmarried couples has quickened in recent years with the relaxation of social cus *486 toms (Douthwaite, Unmarried Couples and the Law, ch 4, passim). It has not, however, been a development free of difficult problems: Is the length of time the relationship has continued a factor? Do the principles apply only to accumulated personal property or do they encompass earnings as well? If earnings are to be included how are the services of the homemaker to be valued? Should services which are generally regarded as amenities of cohabitation be included? Is there unfairness in compensating an unmarried Tenderer of domestic services but failing to accord the same rights to the legally married homemaker? Are the varying types of remedies allowed mutually exclusive or cumulative? (See, generally, Douthwaite, supra; and Clark, J., concurring and dissenting in Marvin v Marvin, supra.)
New York courts have long accepted the concept that an express agreement between unmarried persons living together[2] is as enforceable as though they were not living together (Rhodes v Stone 63 Hun 624, opn in 17 NYS 561; Vincent v Moriarty, 31 App Div 484), provided only that illicit sexual relations were not "part of the consideration of the contract” (Rhodes v Stone, supra, at 17 NYS, p 562, quoted in Matter of Gorden, 8 NY2d 71, 75, supra). The theory of these cases is that while cohabitation without marriage does not give rise to the property and financial rights which normally attend the marital relation, neither does cohabitation disable the parties from making an agreement within the normal rules of contract law (Matter of Gorden, supra, at p 75; see Ann., 94 ALR3d 552, 559).
Even an express contract presents problems of proof, however, as Matter of Gorden illustrates. There Ann Clark and Oliver Gorden moved from Brooklyn to West Fulton, in Schoharie County, where Gorden acquired a tavern in his own name. For seven years Clark and Gorden operated the tavern without other employees, she performing both the work required by her duties in the tavern and by their home life. They lived together and were known in the community as husband and wife until he died. Clark then filed a claim against the estate predicated upon an oral contract pursuant *487 to which Gorden agreed to compensate her for the value of her services, to marry her, to grant her the same rights as she would have as his wife, and to make a will to compensate her. The Surrogate denied the claim because of the "meretricious” relationship. The Appellate Division, finding no proof that there was any relationship between the duties performed in the operation of the inn and the fact that the parties lived together, reversed and awarded claimant $9,000. We reversed, because the evidence was not of the clear and convincing character required to establish a claim against a decedent’s estate, but expressly adopted the rationale of Rhodes v Stone that the unmarried state of the couple did not bar an express contract between them. Ironically, part of the basis /or holding the evidence less than clear and convincing was that "If she had been working as an employee instead of a de facto wife, she would not have labored from 8 o’clock in the morning until after midnight without demanding pay or without being paid” (8 NY2d, at p 75).
While accepting Gorden’s concept that an unmarried couple living together are free to contract with each other in relation to personal services, including domestic or "housewifely” services, we reject the suggestion, implicit in the sentence quoted above, that there is any presumption that services of any type are more likely the result of a personal, rather than a contractual, bond, or that it is reasonable to infer simply because the compensation contracted for may not be payable in periodic installments that there was no such contract.
Changing social custom has increased greatly the number of persons living together without solemnized ceremony and consequently without benefit of the rules of law that govern property and financial matters between married couples. The difficulties attendant upon establishing property and financial rights between unmarried couples under available theories of law other than contract (see Douthwaite, loc. cit.) warrant application of Gorden’s recognition of express contract even though the services rendered be limited to those generally characterized as "housewifely” (Matter of Adams, 1 AD2d 259, affd 2 NY2d 796; cf. Dombrowski v Somers, 41 NY2d 858). There is, moreover, no statutory requirement that such a contract as plaintiff here alleges be in writing (cf. General *488 Obligations Law, § 5-701, subd a, pars 1, 3). The second cause of action is, therefore, sustained.[3]
The first cause of action was, however, properly dismissed. Historically, we have required the explicit and structured understanding of an express contract and have declined to recognize a contract which is implied from the rendition and acceptance of services (Rhodes v Stone, supra; Vincent v Moriarty, 31 App Div 484, supra; see, also, Matter of Adams, supra). The major difficulty with implying a contract from the rendition of services for one another by persons living together is that it is not reasonable to infer an agreement to pay for the services rendered when the relationship of the parties makes it natural that the services were rendered gratuitously (Matter of Adams, supra, at p 262; Robinson v Munn, 238 NY 40, 43). As a matter of human experience personal services will frequently be rendered by two people living together because they value each other’s company or because they find it a convenient or rewarding thing to do (see Marvin v Marvin, 18 Cal 3d, 660, 675-676, n 11, supra). For courts to attempt through hindsight to sort out the intentions of the parties and affix jural significance to conduct carried out within an essentially private and generally noncontractual relationship runs too great a risk of error. Absent an express agreement, there is no frame of reference against which to compare the testimony presented and the character of the evidence that can be presented becomes more evanescent. There is, therefore, substantially greater risk of emotion-laden afterthought, not to mention fraud, in attempting to ascertain by implication what services, if any, were rendered gratuitously and what compensation, if any, the parties intended to be paid.
Similar considerations were involved in the Legislature’s abolition by chapter 606 of the Laws of 1933 of common-law marriages in our State. Writing in support of that bill, Surro *489 gate Foley informed Governor Lehman that it was the unanimous opinion of the members of the Commission to Investigate Defects in the Law of Estates that the concept of common-law marriage should be abolished because attempts to collect funds from decedents’ estates were a fruitful source of litigation. Senate Minority Leader Fearon, who had introduced the bill, also informed the Governor that its purpose was to prevent fraudulent claims against estates and recommended its approval. The consensus was that while the doctrine of common-law marriage could work substantial justice in certain cases, there was no built-in method for distinguishing between valid and specious claims and, thus, that the doctrine served the State poorly.
The notion of an implied contract between an unmarried couple living together is, thus, contrary to both New York decisional law and the implication arising from our Legislature’s abolition of common-law marriage. The same conclusion has been reached by a significant number of States other than our own which have refused to allow recovery in implied contract (see Ann., 94 ALR3d 552, 559). Until the Legislature determines otherwise, therefore, we decline to recognize an action based upon an implied contract for personal services between unmarried persons living together.
For the foregoing reasons, the order of the Appellate Division should be modified in accordance with this opinion and, as so modified, should be affirmed, with costs to plaintiff.

. Paragraph 9, one of the realleged allegations, avers that "plaintiff performed work, labor and services for the defendant in the nature of domestic duties and business services at the request of the defendant” (emphasis supplied).

. Much of the case law speaks of such a relationship as "meretricious”. Defined as "Of or pertaining to a prostitute; having a harlot’s traits” (Webster’s Third New International Dictionary Unabridged, p 1413), that word’s pejorative sense makes it no longer, if it ever was, descriptive of the relationship under consideration, and we, therefore, decline to use it.

. We have not overlooked the holding of Dombrowski v Somers (41 NY2d 858, 859) that the words "take care of’ are too vague to spell out a meaningful promise. In the instant complaint we regard those words as surplusage in light of the further allegation that the profits of the partnership were to be used and applied for the equal benefit of both plaintiff and defendant. Nor can we accept the dissent’s concept that there need necessarily be "profits” from the domestic services. Plaintiff alleges an express agreement of partnership under which she was to contribute services in return for which she was to share in the profits from the business conducted by defendant; more is not required to make defendant accountable for profits of the partnership.