LAURA J. DONNELL, Appellant, v CONRAD E. STOGEL, Respondent.

Second Department, September 17, 1990

**APPEARANCES OF COUNSEL**

*Grais & Richards (Lani A. Adler* and *David J. Grais* of counsel), for appellant.

*William J. Davis* for respondent.

**OPINION OF THE COURT**

BROWN, J.

The testimony adduced at the nonjury trial established that the plaintiff, Laura J. Donnell, and the defendant, Conrad E. Stogel, began dating in February 1978, at a time when the plaintiff and her husband had been separated for almost two years. The plaintiff's divorce would not become final until more than two years later. Four to seven months after they had begun seeing each other, the parties started living together. Shortly thereafter, the plaintiff, who had met the defendant while they were co-workers, was dismissed from her secretarial position because, it was claimed, the parties' relationship was interfering with the defendant's work. The plaintiff thereafter began to devote her time to household chores, and to assist the defendant in connection with his employment as a shoe salesperson. Specifically, the plaintiff, a college graduate and former fine arts teacher, prepared shoe sketches, purchased shoes which the defendant wished to buy or copy, attended trade shows and social functions, and accompanied the defendant on business trips.

In 1980, the defendant began negotiating for and ultimately engineered the development of a new footwear company. The plaintiff participated extensively in these negotiations, and

her assistance and encouragement enabled the defendant to obtain a greater partnership share in the business than he had originally been offered. Upon the company's formation, the plaintiff assisted the defendant in setting up and decorating the company's offices, hiring employees, negotiating with shoe manufacturers, and contacting potential customers. She also designed the company logo, drew boxtops, sketched shoe design renderings, and prepared advertisements. Essentially, the plaintiff's contributions amounted to full-time employment. Although she did not receive a salary, the plaintiff was provided with business cards on which she was denominated "Special Account Executive". Additionally, the defendant promised the plaintiff that she would receive a salary and a promotion as soon as the business started to become profitable.

In November 1981, the defendant returned from a business trip to Italy and indicated to the plaintiff that he wished to discontinue both their personal and business relationships. The ensuing break-up of the parties' relationship was apparently amicable. The defendant expressed concern about the plaintiff's financial future in view of the fact that she had been relying upon her eventual full-time, salaried employment with the footwear company and suggested that he and the plaintiff enter into a written agreement with respect thereto. As a result, the parties consulted an attorney to determine what would be required in order to enter into a valid contract. They were advised that they should make clear that the plaintiff was being compensated for the services she had performed. The defendant ultimately drafted a handwritten agreement, which was signed by both parties before a notary public, under the terms of which the defendant agreed to provide the plaintiff with a "salary" of $35,000 a year for three years, commencing in 1982, and a yearly bonus in that amount for three years, commencing the first year that the company became profitable. The salary would continue for a fourth year if the plaintiff was still unemployed, and health insurance would be provided to her during the term of the agreement. The agreement provided, however, that all payments and benefits thereunder would cease if the plaintiff remarried. According to the plaintiff, the amount of the salary was determined by the defendant, based upon what he had earned in his former employment as a salesperson. The consideration upon which the payments to the plaintiff were based was set forth in the agreement as follows: "for living

together under the same roof as man and wife for 4 years and during that time contributing to the general well being of [the defendant's] business career, providing sound business counsel and working without salary in the development of Marion Footwear". Pursuant to the agreement the plaintiff was paid $8,000 in 1982 and $4,000 in 1983. The defendant thereafter repudiated the agreement, prompting the instant lawsuit.

At the close of the plaintiff's case, during which she was the only witness to testify, the defendant moved to dismiss the complaint for failure to make out a prima facie case. The trial court granted the motion *(see, Donnell v Stogel,* 139 Misc 2d 72), finding that the contract was unenforceable because it facilitated adultery and that, since the main objective of the agreement was to compensate the plaintiff for cohabitating with the defendant, it was not severable. Even if the illegal aspects of the contract were merely incidental to the legal aspects thereof, opined the court, the contract still could not be severed because it was impossible to separately value the business aspects thereof from those that were personal. The *plaintiff appeals from the judgment in the defendant's favor, and we reverse.*

"A motion to dismiss the complaint at the close of the plaintiff's case should not be granted unless it is clear that by no rational process could the jury find in favor of the nonmoving party *(Pontiatowski v Baskin-Robbins,* 91 AD2d 1035; *Keefner v City of Albany,* 77 AD2d 747, *lv denied* 52 NY2d 704)" *(O'Neil v Port Auth.,* 111 AD2d 375, 376). In deciding such a motion the court must view the evidence in the light most favorable to the plaintiff, and give her the benefit of every inference which could reasonably be drawn therefrom *(see, O'Neil v Port Auth., supra).* Keeping in mind these principles, we conclude that the motion to dismiss the complaint was improperly granted.

At the outset, we point out that a contract between parties who are living together is not unenforceable merely by virtue of the fact that their relationship had not been solemnized in a formal marriage ceremony *(see, Morone v Morone,* 50 NY2d 481; *Matter of Gorden,* 8 NY2d 71). "The theory of these cases is that while cohabitation without marriage does not give rise to the property and financial rights which normally attend the marital relation, neither does cohabitation disable the parties from making an agreement within the normal rules of contract law *(Matter of Gorden, supra,* at 75; *see,* Ann., 94 ALR3d 552, 559)" *(Morone v Morone, supra,* at 486). In most circum-

stances, however, the problem lies in the fact that this type of a contract may not be implied by the parties' conduct alone, since it has been deemed to be "conceptually so amorphous as practically to defy equitable enforcement" *(Morone v Morone, supra,* at 484), and to be inconsistent with the policy enunciated when this State abolished common-law marriages *(see, Morone v Morone, supra,* at 484; *see also, Matter of Gorden, supra).* This problem, however, does not exist at bar, since the parties entered into a written agreement expressing their intention that monetary compensation be involved and specifying the terms of that compensation and the consideration therefor *(cf., McCall v Frampton,* 81 AD2d 607).

As to the enforceability of the parties' agreement, contrary to the trial court's finding, their agreement was not one to promote divorce or to facilitate adultery, as it was entered into long after the divorce was final and the adultery had ceased *(cf., McCall v Frampton,* 81 AD2d 607, *supra).* Moreover, we do not agree that the "main objective" of the agreement was to compensate the plaintiff for cohabiting with the defendant. This conclusion is supported neither by the wording of the contract nor by the evidence adduced by the plaintiff, which must, as previously indicated, be viewed in the light most favorable to her. Even if this were the "main objective" of the parties' agreement, this would not serve to render the agreement unenforceable, since this court is not aware of any statutory or common-law authority in this State which considers cohabitation between unmarried parties illegal.

█ We do not disagree that to the extent that the phrase "[i]n consideration for living together under the same roof as man and wife" can be construed to provide that adultery prior to the plaintiff's divorce, and sexual relations between the parties subsequent to the plaintiff's divorce, were part of the consideration for the parties' agreement, the agreement must be considered illegal and unenforceable *(see, Matter of Gorden,* 8 NY2d 71, *supra; Artache v Goldin,* 133 AD2d 596; *Stephan v Shulman,* 130 AD2d 484). However, such a finding is not fatal to the plaintiff's claim. As this court recently indicated: "where an agreement consists in part of an unlawful objective and in part of lawful objectives, the court may sever the illegal aspects and enforce the legal ones, so long as the illegal aspects are incidental to the legal aspects and are not the

main objective of the agreement *(see, McCall v Frampton,* 81 AD2d 607, 608-609; *Matter of Gorden,* 8 NY2d 71, 75; 6A Corbin, Contracts §§ 1534-1535, at 816, 821-822)" *(Artache v Goldin,* 133 AD2d 596, 599, *supra; see also, Beer v Heller,* 148 AD2d 649; *Rose v Elias,* NYLJ, May 4, 1990, at 23, col 1 [Sup Ct, NY County, Saxe, J.]). The evidence at bar, when viewed in the light most favorable to the plaintiff, supports the conclusion that the illegal aspect of this agreement is not at its root and that, for the most part, the agreement is supported by valid consideration. Indeed, the plaintiff testified that the parties did not engage in sexual relations for at least the last year of their almost four-year relationship, which lends further support to the proposition that the consideration of living together "as man and wife for 4 years" did not relate primarily to engaging in sexual relations.

Nor do we agree with the trial court's further conclusion that, even assuming that the illegal aspect of the agreement was incidental to the legal aspects thereof, the agreement is not severable. The evidence adduced thus far establishes that the purported "illegality" is only a small part of the consideration involved *(see,* 6A Corbin, Contracts § 1525, at 775), the plaintiff has performed her part of the agreement *(see, Stephan v Shulman,* 130 AD2d 484, *supra; cf., Beer v Heller,* 148 AD2d 649, *supra)* and, under the circumstances of this case, the agreement involved is not one of serious moral turpitude *(see,* 6A Corbin, Contracts § 1534, at 816-817). Accordingly, at this juncture the evidence supports the conclusion that the claimed illegal aspect of the contract may be severed, and the remainder of the contract enforced as though that aspect was never a part thereof.

■ In sum, viewing the evidence in the light most favorable to the plaintiff, it cannot be said that by no rational process could the trier of fact find in favor of the plaintiff. Therefore, the trial court erred in granting the defendant's motion to dismiss the complaint at the close of the plaintiff's case. We note, however, that since neither party has moved for summary judgment, we are without authority to grant the plaintiff's request for same *(see, Mihlovan v Grozavu,* 72 NY2d 506, 508). Moreover, since the defendant has not been given an opportunity to present evidence on his own behalf, consideration of the issue of whether the plaintiff is entitled to judg-

ment in her favor would not be appropriate at this juncture *(see,* CPLR 4401).

THOMPSON, J. P., EIBER and MILLER, JJ., concur.

Ordered that the judgment is reversed, on the law, with costs, the complaint is reinstated, and the matter is remitted to the Supreme Court, Queens County, for further proceedings.