OPINION OF THE COURT
Peter P. Sweeney, J.
In this action involving a contract for the performance of medical services in connection with a surrogate parenting contract, defendant Kaleed Sultan, M.D., sued herein as Doctor Kaleed Sultan (defendant), moves for an order pursuant to CPLR 3211 (a) (7) dismissing the two causes of action alleged in plaintiffs amended complaint[1] for failure to state a cause of action. The defendant maintains that plaintiffs first cause of action does not state a cause of action for breach of contract because: (1) the alleged contract is against public policy and unenforceable; (2) there is no allegation that the contract was in writing as required by General Obligations Law § 5-701 (a) (1); and (3) the plaintiff did not allege that the defendant doctor made a “special promise” to effect a certain result. The defendant further maintains that plaintiffs second cause of action does not state a cause of action for fraud because it is repetitive of the breach of contract action.
For the following reasons, defendant’s motion is denied in part and granted in part.
Background:
In plaintiffs first cause of action for breach of contract, she alleged that in or about March 2000, she consulted with the defendant about transferring her embryos to another woman for the purpose of having that woman carry them until a child was born (11 3). She alleged that the defendant doctor informed her that he did this type of work “all the time” and that she would have to legally adopt the child once the child was born (id.). She alleged that defendant instructed her to find a suitable person to be the surrogate mother and to return to him for the necessary medical procedures once such a person had been found (id.)
Plaintiff further alleged that the defendant referred her to an attorney who specialized in such matters and that, when she consulted with this attorney, she referred her to a social worker to assist her with the adoption proceeding (1ÍU 4, 5). Plaintiff *876 also alleged that she eventually found a woman willing to be the surrogate and that, in August 2000, she told the defendant that she was ready to proceed with the necessary medical procedures (11 6). At this point, she alleged, the defendant “agreed to provide the services necessary which would result in an adoption by the plaintiff of the child to be born, and gave her prescriptions for the necessary medication for the pre-surgical procedure” (1Í 6). She also alleged that she paid the defendant various fees totaling $18,325 for the medical work (1i 7).
On September 4, 2000, she alleged the defendant retrieved 12 oocytes from her, of which “eight (8) embryos were preserved” (11 8). While she was on the operating table, she asked the defendant when he would implant the embryos into the surrogate (1i 9). In response, she alleged, he stated that “he was not able to do anything further than to remove the embryos from her because it was illegal for him to inseminate them in the surrogate” (K 9). She further alleged that defendant told her “that he would do nothing further about inseminating another woman with the retrieved eggs” (id.).
Plaintiff alleged that, as a result of defendant’s failure to perform his part of the agreement, she sustained damages in the amount of $25,000, said sum representing the fees paid to the defendants for the medical services, the fees paid to the attorney and the social worker in connection with the anticipated adoption proceeding, and the fees paid for the drugs she purchased in order to prepare for the medical procedures (1i 10).
In the second cause of action, plaintiff incorporated all of the above facts (1i 12) and alleged, “On or about March 17, 2000, the [defendant] falsely and fraudulently stated and represented to her that [he] could and would perform the necessary medical procedure to obtain the plaintiffs embryos and implant them into a second woman (surrogate mother) who would carry them through birth, all within the City of New York” (1113). She further alleged that “the representations made by the [defendant] were false, and in truth the fact was that the [defendant was] not legally permitted to perform such transplantation, such conduct being illegal within the State of New York” (U 14). She alleged that the defendants knew that the statements were false at the time they were made, and that they were made with “intent to deceive and defraud the plaintiff and induce her to enter into a contract for the transfer of such embryos from herself to a surrogate mother and thereafter to institute adoption proceedings of the newly born child from the surrogate mother to the plaintiff, all within the City of New York” (1115). *877 Finally, plaintiff alleged that she did not know that these statements were false and that she “relied upon these statements and was thereby induced to proceed with the medical procedure to effect such purpose” (1116), and that she would not have entered the agreement with defendant had she known of the illegality of the egg transfer for the purpose of adoption in New York (U 17). As a result of the alleged false and fraudulent representations of the defendant, plaintiff alleged that she was damaged in the amount of $25,000 (1i 18).
Discussion:
The Cause of Action for Breach of Contract:
The court’s inquiry on a motion to dismiss under CPLR 3211 (a) (7) is narrowly defined. The court must “accept the facts alleged as true . . . and determine simply whether the facts alleged fit within any cognizable legal theory” (Morone v Morone, 50 NY2d 481, 484 [1980] [citation omitted]; see Leon v Martinez, 84 NY2d 83, 87-88 [1994]; Salles v Chase Manhattan Bank, 300 AD2d 226 [2002]). The complaint must be liberally construed (CPLR 3026; see New York Trap Rock Corp. v Town of Clarkstown, 299 NY 77 [1949]) and the court must accept as true not only the material allegations of the complaint, but also “whatever can be reasonably inferred therefrom” in favor of the pleader (McGill v Parker, 179 AD2d 98, 105 [1992]; see also Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 318 [1995]). A court is obligated to “sustain the pleading when a cause of action may be discerned, even if inartfully stated” (Fischbach & Moore v Howell Co., 240 AD2d 157, 157 [1997]).
Accepting the allegations of the complaint as true and construing the inferences that can be drawn therefrom in plaintiffs favor, the court finds that the plaintiff sufficiently stated a cause of action for breach of contract. The complaint clearly “specifies the terms of the agreement, the consideration, the performance by [plaintiff] and the basis of the alleged breach of the agreement by defendant” (Furia v Furia, 116 AD2d 694, 695 [1986]; see also Tuck & Co. v Bronxville Props., 267 AD2d 423 [1999]).
Defendant’s contention that the contract was illegal and against public policy is without merit. Defendant cites no legal authority supporting this proposition and relies solely on the fact that plaintiff alleged that the contract was illegal in her complaint. Although “[s]urrogate parenting contracts are . . . *878 contrary to the public policy of this state, and are void and unenforceable” (Domestic Relations Law § 122), the alleged contract between the plaintiff and defendant was not a surrogate parenting contract. A surrogate parenting contract is defined as an
“agreement, oral or written, in which:
“(a) a woman agrees either to be inseminated with the sperm of a man who is not her husband or to be impregnated with an embryo that is the product of an ovum fertilized with the sperm of a man who is not her husband; and
“(b) the woman agrees to, or intends to, surrender or consent to the adoption of the child born as a result of such insemination or impregnation” (Domestic Relations Law § 121 [4]).
A contract between a “genetic mother”[2] 3and a doctor for the performance of medical services in connection with a surrogate parenting contract does not come within the purview of the definition. In fact, Domestic Relations Law § 123 (1) (b) expressly permits a doctor to receive compensation for certain services provided in connection with a surrogate parenting contract and provides that
“[n]o person or other entity shall knowingly request, accept, receive, pay or give any fee, compensation or other remuneration, directly or indirectly, in connection with any surrogate parenting contract, or induce, arrange or otherwise assist in arranging a surrogate parenting contract for a fee, compensation or other remuneration, except for . . .
“(b) payments for reasonable and actual medical fees and hospital expenses for artificial insemination or in vitro fertilization services incurred by the mother[3] in connection with the birth of the child” (emphasis added).
Inasmuch as Domestic Relations Law § 123 (1) (b) expressly *879 authorizes a physician to receive compensation for providing artificial insemination and/or in vitro fertilization services in connection with a surrogate parenting contract, it would be illogical to conclude that a contract for the performance of such services is void and unenforceable.
The court also rejects defendant’s contention that the plaintiff’s failure to allege that the contract was in writing requires dismissal of the action. General Obligations Law § 5-701 (a) (1) requires that a contract be in writing which “[b]y its terms is not to be performed within one year from the making thereof.” Although it may have been unlikely that the alleged contract between the plaintiff and defendant could have been completed within a year, to fall within General Obligations Law § 5-701 (a) (1), there must be absolutely no possibility of performance of the contract by its terms within one year (Louros v Cyr, 175 F Supp 2d 497 [2001]; Mann v Helmsley-Spear, Inc., 177 AD2d 147, 149-150 [1992]). Such is not the case here.
Finally, assuming plaintiff was required to allege that the defendant doctor made a special promise to effect a specific result to allege an actionable breach of contract claim (see e.g. Varone v Delman, 272 AD2d 320 [2000]; Nicoleau v Brookhaven Mem. Hosp., 201 AD2d 544, 545 [1994]; Bobrick v Bravstein, 116 AD2d 682, 683 [1986]; Monroe v Long Is. Coll. Hosp., 84 AD2d 576 [1981]), plaintiff sufficiently complied with this requirement by alleging that defendant “agreed to provide the services necessary which would result in an adoption by the plaintiff of the child to be born” (complaint 1i 6). Furthermore, there is no valid basis to impose this requirement in this case, in that plaintiffs claim is based upon an alleged refusal of a physician to provide elective procedures that he was paid to provide, and the damages sought are out-of-pocket expenses incurred in reliance on defendant’s promise to provide the services and not for pain and suffering.
The Cause of Action for Fraud:
Turning to plaintiff’s fraud claim, even though plaintiff’s complaint can be construed as alleging that defendant had no intention of performing the medical services at issue at the time the contract was entered into, “a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations” (Rocanova v Equitable Life Assur. Socy. of U.S., 83 NY2d 603, 614 [1994]). Defendant’s alleged false promise that he would *880 provide the services at issue was not sufficiently collateral or extraneous to the terms of the underlying agreement between the parties to provide support for an independent fraud claim (Deerfield Communications Corp. v Chesebrough-Ponds, Inc., 68 NY2d 954, 956 [1986]; see also LaBozzo v Brooks Bros., 2002 NY Slip Op 40222[U], *5 [2002]).
For the above reasons, it is hereby ordered that defendant’s motion to the extent it seeks dismissal of plaintiffs first cause of action for failure to state a cause of action is denied and granted to the extent it seeks dismissal of plaintiff’s second cause of action for failure to state a cause of action.

. The copy of the amended complaint that was submitted to the court was not verified.

. Domestic Relations Law § 121 (3) defines a “Genetic mother” as “a woman who provides an ovum for the birth of a child born pursuant to a surrogate parenting contract.”

. Domestic Relations Law § 121, the definitional section of article 8 of the Domestic Relations Law which governs surrogate parenting contracts, distinguishes between “birth mothers” and “genetic mothers.” Inasmuch as Domestic Relations Law § 123 (1) (b) refers only to “mothers,” it would appear that both genetic mothers and birth mothers fall within its breadth.