Harvey Keitel, Plaintiff,

against
E*Trade Financial Corporation, Defendant.


652220/2015

Plaintiff 
BUSHELL SOVAK OZER & GULMI LLP
274 Madison Avenue, Suite 901
New York, New York 10016
BY: VICTOR BUSHELL
CEM OZER
Defendant
QUINN EMANUAL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor 
New York, New York 10010
BY: RENITA SHARMA
COREY WORCESTER
FAITH E. GAY
MARC GREENWALD


Charles E. Ramos, J.

In motion sequence 003, defendant E*TRADE Financial Corporation ("E*Trade") moves to dismiss plaintiff Harvey Keitel's ("Mr. Keitel") first amended complaint ("Complaint") pursuant to CPLR 3211(a)(1) and (a)(7) with prejudice.
For the reasons set forth below, this Court grants E*Trade's motion to dismiss, and dismisses the Complaint in its entirety with prejudice.
Background
The following factual allegations are taken from the Complaint and its accompanying exhibits and are presumed to be true.
Mr. Keitel is an actor residing in New York, known for his appearances in movies such as Taxi Driver, Reservoir Dogs, Pulp Fiction, and The Grand Budapest Hotel (Complaint, ¶¶ 1-2). 
E*Trade is an online brokerage firm, with its principal place of business in New York, New York (Complaint, ¶ 3). E*Trade provides retail brokerage and related services and products to individual and institutional investors. 
Ogilvy Group, Inc., d/b/a Ogilvy & Mather NY ("Ogilvy") is a large advertising firm with its principal offices in New York, New York (Complaint, ¶3). In early 2014, E*Trade hired Ogilvy to develop an advertising campaign for E*Trade. In turn, Ogilvy hired Octagon First Call ("Octagon"), a marketing agency and talent procurement firm, to help procure an individual to star in the new ad campaign (Complaint, ¶ 5). Mr. Keitel alleges that at all relevant times, Ogilvy and Octagon acted as agents on behalf of E*Trade (Complaint, ¶ 6).
On January 23, 2014, Maria Conti ("Ms. Conti") of Octagon contacted Karen Sellars ("Ms. Sellars") of International Creative Management, Inc. ("ICM"), Mr. Keitel's agent, to inquire into whether Christopher Walken ("Mr. Walken"), an actor best known for his performances in Annie Hall, The Dogs of War, Batman Returns, and Catch Me If You Can, would be interested in starring in a series of commercials for E*Trade on February 10, 2014 (Complaint, ¶ 7).
Mr. Walken notified Ms. Sellars that he was not interested in starring in the series of commercials for E*Trade (Complaint, ¶ 8).
Ms. Sellars also notified Ms. Conti that Mr. Keitel was potentially interested in starring in the series of commercials (Complaint, ¶ 9). In response, Ms. Conti, allegedly on behalf of E*Trade, expressed an interest in Mr. Keitel and requested that Ms. Sellers determine whether Mr. Keitel was available to shoot the commercials on E*Trade's tight schedule (Complaint, ¶ 10).Subsequently, on January 24, 2014, Ms. Conti sent Ms. Sellers an email with the subject line "Harvey Keitel eTrade" and a subject line that said: Keitel-Ogilvy-eTrade-non-binding-Term Sheet (Complaint, Ex. A)("January 24 Email")("Term Sheet").
The attached term sheet provides, in relevant part:
This letter sets forth the general intent of the parties to discuss in good faith the terms and conditions of Artist's potential participation in E*Trade's advertising, providing that neither party shall be bound until the parties execute a more formal written agreement, which shall include terms and conditions standard for agreements of this type, including Client's standard warranty, adjustment, force majeure, termination, ownership, morals clause, confidentiality and indemnification provisions, subject to good faith negotiations.
(Complaint, Ex. A).
The Term Sheet was sent as a Microsoft Word document (Complaint, Ex. A, at 4). The Term Sheet also contained many blanks (Id.). It is undisputed that it was not signed by either party and was not on Ogilvy letterhead (Id.).
The Term Sheet also provided for E*Trade's understanding as to "some of the principal terms of the proposed agreement," such as the cost, term, number of production days, and E*Trade's right to use the resulting materials. (Complaint, Ex. A, p. 1-2).
Additionally, the Term Sheet contained provisions involving two radio commercials and an online advertisement, and provisions related to banner ads, digital materials, and compensation (Complaint, Ex. C, at 1-3).
On January 24, 2014, Ms. Conti emailed Maureen Phillips ("Ms. Phillips") of Ogilvy, asking whether she could respond affirmatively to the email from Ms. Sellars confirming their recent conversation that the offer is firm pending a background check. Ms. Phillips then wrote to Melissa Bartolini ("Ms. Bartolini"), of Ogilvy, stating "Melissa? We can make a firm offer yes?" (Bushell Aff., Ex. 6).
Ms. Bartolini then responded stating "meaning we can't back out except if the background check turns something up, right?" (Bushell Aff., Ex. 6).
That same day, Ms. Conti expressed hesitation to Ms. Sellars, explaining that the Chairman of E*Trade was presumably still "fixated" on Mr. Walken. Based on that exchange with Ms. Conti, Ms. Sellars notified Mr. Keitel that there was a "screw-up by E*Trade, and that no offer existed at that time" (Complaint, ¶¶ 14-15).
Thereafter, Ms. Sellars reconfirmed with Mr. Walken that he was still not interested in the E*Trade campaign. When Ms. Sellars relayed Mr. Walken's lack of interest to Ms. Conti, Ms. Conti stated that E*Trade wishes to quickly move forward with Mr. Keitel due to their tight deadline (Complaint, ¶¶ 17-18).
On January 27, 2014, Ms. Sellars requested that Ms. Conti resubmit the January 24 Email and Term Sheet and delete the terms "non-binding" from the subject line to change it to "firm and binding" (Complaint, ¶¶ 19-20). Ms. Conti abided by her request and also edited the text of the January 24 email to state:
Hi Karen,
Please consider the attached term sheet a firm and binding offer for the services of your client, Harvey Keitel on behalf of E*Trade, contingent upon the result of the background check, and of course coming to terms on scripts, compensation, etc.
(Complaint, Ex. C).
On January 27, 2014, Russell Messner ("Mr. Messner") of Ogilvy wrote to Ms. Phillips of Ogilvy, copying Rich Muhlstock ("Mr. Muhlstock") and Liza Landsman ("Ms. Landsman"), both employees of E*Trade, stating, in relevant part:
We have the approval to make a formal offer to Keitel. E*Trade recognizes this is a commitment. They are comfortable assuming that Keitel does not:
1. Have a series of stipulations that prevent us from telling the creative & strategic story we need to i.e. I wont say E*trade or Type E. And won't allow any products to be referenced in the spot.
2. Have a series of stipulations that make the production untenable or send budget beyond reasonable levels i.e. We have to shoot with Spike Jonze using 48 frames per second in the south of France.(Bushell Aff., Ex. 8).
On January 28, 2014, Ms. Sellars notified Ms. Conti that E*Trade and Mr. Keitel "have a deal and were all good," to which Ms. Conti responded "great." During this conversation, Ms. Sellars and Ms. Conti discussed certain terms, including, but not limited to, the types of banners to be used and in-store usage (Complaint, ¶¶ 47-48). Ms. Sellars also told Ms. Conti to "expect back a redline," which would show changes to the Term Sheet Complaint, Ex. I at ETRADE00002320).
Subsequently, that same day, Ms. Sellars emailed Ms. Conti, stating, in relevant part:
I am very pleased that Harvey has agreed to do the 3 commercials for E Trade. Per our conversations, can you please get us the Long Form contract as soon as possible so I can get it to your business affairs. Also, the city and days of shooting are equally important so I can run them by Harvey. And finally, please keep us in the loop in terms of the director. As I said, Harvey really wants a director who knows his work. Maybe someone like Ridley Scott, etc. and...would like to have rehearsal time.(Complaint, Ex. G).
On January 29, 2014, Ms. Conti emailed Ms. Sellars, notifying her that the campaign would be moving in a different direction and that they will not be pursuing Mr. Keitel (Complaint, Ex. H).
In response, Ms. Sellars demanded that Ms. Conti call her immediately (Complaint, ¶ 52). During that conversation, Ms. Conti offered Mr. Keitel a "kill fee" of $150,000, which Ms. Sellars did not accept.
On January 29, 2014, Mr. Muhlstock emailed Ms. Landsman, stating, in relevant part:
The agency still feels we are on the hook even though the [*2]changes seem material to me. Success in their mind is we only pay $150K...[a]t this point per Russ's email earlier they are trying to resolve quietly and pay the 10%.(Bushell Aff., Ex. 9). On June 22, 2015, Mr. Keitel commenced this action alleging breach of contract against E*Trade.
On August 12, 2015, E*Trade moved to dismiss the Complaint pursuant to CPLR 3211(a)(1) and (a)(7).
At oral argument on March 1, 2016, the Court granted E*Trade's motion to dismiss.
On June 13, 2016, Mr. Keitel moved for leave to renew his opposition to Defendant's motion to dismiss and to amend his complaint to include additional facts and documents received through discovery.
On October 31, 2016, the Court denied Mr. Keitel's request for leave to renew, but granted his motion to file the Complaint that incorporated the newly discovered facts and alleged breach of contract.
On November 21, 2016, E*Trade filed the instant motion seeking to dismiss the Complaint.
Discussion
E*Trade moves to dismiss Mr. Keitel's Complaint in its entirety, with prejudice, pursuant to CPLR 3211(a)(1) and (a)(7).
In deciding a motion to dismiss under CPLR 3211(a)(7), a court must consider whether the complaint states a cause of action (Ackerman v 305 East 40th Owners Corp., 189 AD2d 665, 666 [1st Dept 1993]). The Court must accept the facts as alleged to be true and determine whether the Plaintiff's facts fit within any cognizable legal theory (Morone v Morone, 50 NY2d 481 [NY 1980])(internal quotations omitted).
In order to succeed on a motion to dismiss under CPLR 3211[a][1], the documents presented must resolve all factual issues as a matter of law (Gephardt v Morgan Guar. Trust Co. Of NY, 191 AD2d 229 [1st Dept 1993]). Dismissal is warranted under CPLR 3211[a][1] only if the documentary evidence submitted utterly refutes plaintiff's factual allegations (Amsterdam Hospitality Group, LLC v Marshall-Alan Associates, Inc., 120 AD3d 431, 433 [1st Dept 2014])(internal quotations omitted).
At issue is whether a the Term Sheet constitutes a binding contract or merely an agreement to agree. Absent an enforceable agreement, E*Trade cannot be held liable under a breach of contract theory (Harris v Seward Park Housing Corp., 79 AD3d 425, 426 [1st Dept 2010]). 
E*Trade argues that dismissal is appropriate because, as this Court has already determined, the Term Sheet cannot be binding because it states "neither party [would] be bound until the parties execute a more formal written agreement..."
(Complaint, Ex. C). E*Trade further alleges that the Term Sheet cannot be a contract because it lacked numerous material terms, including the scheduling, location, director, and artistic intent.
E*Trade alleges that even if the Term Sheet constituted an offer, Ms. Sellars failed to clearly and unequivocally accept its terms (Thor Props., LLC v Willspring Holdings LLC, 118 AD3d 505, 507 [1st Dept 2014]). After receiving the Term Sheet, Ms. Sellars not only requested a long form contract, but also asked for further information on the days and location of shooting, rehearsal time, and the director (Complaint, Ex. G). E*Trade contends that a request for additional clarification of material terms cannot be an unequivocal acceptance of an offer.
In opposition, Mr. Keitel maintains that, when looking at the totality of the circumstances, the conduct of E*Trade demonstrates an intention to be bound, as evidenced by the exchange of emails between Ms. Sellars and Ms. Conti, internal communications at Ogilvy and E*Trade regarding making a firm offer to Mr. Keitel, and the expedited schedule for shooting the commercial (Complaint, ¶¶ 21-24).
Mr. Keitel cites to PMJ Capital Corp. v PAF Capital, LLC, to support his argument that the Court should look beyond the plain language of the Term Sheet because E*Trade did not give "forthright, reasonable signals that it intended only to be bound by a written agreement signed by both parties" (PMJ Capital Corp. v PAF Capital, LLC, 98 AD3d 429, 431 [1st Dept 2012]).
Mr. Keitel maintains that the parties had a meeting of the minds on all material points, including the hours, compensation, terms of use, and production of three 30-second television commercials and two 60-second radio commercials, thereby creating a sufficiently definite agreement (Complaint, Ex. C) (Aiello v Burns Int'l Sec. Servs. Corp., 110 AD3d 234, 242 [1st Dept 2013]). Further, Mr. Keitel asserts that pursuant to Newmark & Co. Real Estate Inc. v 2615 East 17 Street Realty LLC, the printing of Ms. Conti's name at the end of her email constitutes a signature (Newmark & Co. Real Estate Inc. v 2615 East 17 Street Realty LLC, 80 AD3d 476 [1st Dept 2011]).
Lastly, Mr. Keitel asserts that the conduct of E*Trade clearly waives any previous requirement that there be a fully executed written agreement in order to bind the parties. Specifically, Mr. Keitel alleges that Ms. Conti's resubmission of the Term Sheet with the terms "final and binding" and a subject line of "Harvey Keitel Firm Offer" combined with Ms. Conti's actions to immediately seek authorization from E*Trade evidences a waiver of the non-binding language of the Term Sheet (Complaint, Ex. C).
Mr. Keitel has failed to persuade the Court that the plain language of the Term Sheet is ambiguous, or that the phrase [*3]"neither party shall be bound" can be susceptible to more than one interpretation (Chimart Assoc. v Paul, 66 NY2d 570, 573 [1986]). Without evidence of an ambiguity, the Court need not look beyond the four corners of the Term Sheet to determine the existence of a valid contract (W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). It is undisputed that the Term Sheet provides for a subsequent written agreement. Thus, absent a signed writing providing for material terms as mandated by the Term Sheet, there is no contract between the parties (Amcan Holdings, Inc. v Can. Imperial Bank of Commerce, 70 AD3d 423, 426 [1st Dept 2010]).
Even if the Court were to look to extrinsic evidence, the extrinsic evidence provided is insufficient to constitute a meeting of the minds over material terms (Riom Corp v McLean, 23 AD3d 298 [1st Dept 2005]). Mr. Keitel cites to internal emails between employees of Ogilvy and Octagon, as agents of E*Trade, labeling the offer as firm. It is undisputed that Ms. Sellars and Mr. Keitel were not privy to the internal communication (Complaint, Ex. B, D, E). Without conveying these terms to Mr. Keitel, there can be no meeting of the minds.
Based on the Term Sheet's plain language, there were numerous terms, including, but not limited to, termination, ownership, and confidentiality, that the parties had to memorialize in a subsequent written agreement (Complaint, Ex. C). Absent a meeting of the minds on such material terms, there can be no ensuing breach (Mode Contempo, Inc. v Raymours Furniture Co., Inc., 80 AD3d 464 [1st Dept 2011]).
Mr. Keitel's comparison of the current case to Newmark & Co. Real Estate Inc. v 2615 East 17 Street Realty LLC is without merit (Newmark & Co. Real Estate Inc. v 2615 East 17 Street Realty LLC, 80 AD3d 476 [1st Dept 2011]). In Newmark & Co., the First Department held that an email, which set forth all the relevant terms of the agreement and under which the sending party's name is typed, can constitute a writing for the statute of frauds purposes (Id. at 477). Here, the Term Sheet explicitly did not contain all material terms and was not the product of lengthy negotiations. Therefore, unlike in Newmark & Co., there can be no meeting of the minds.
Similarly, in support of his argument that the Court should look to the totality of the circumstances, Mr. Keitel cites to PMJ, where the Court held that the fact that the document contained all material terms, combined with negotiations between the parties and the payment and retention of a down payment, created a triable issue of fact, despite the absence of a formally executed agreement (PMJ, 98 AD3d at 431). The current case is unlike PMJ, as here, Mr. Keitel has failed to allege a series of negotiations or that the Term Sheet was finalized or [*4]ready for execution (Id.).
Further, even if the Court were to find that the Term Sheet constituted an offer, Mr. Keitel has failed to establish an unqualified acceptance of such offer, extinguishing the initial provisions of the Term Sheet (Thor Props., LLC v Willspring Holdings LLC, 118 AD3d 505 [1st Dept 2014]). Ms. Sellar's recognition of Mr. Keitel's "agree[ment] to do the three E*Trade commercials" is insufficient to constitute an acceptance. In that same email, Ms. Sellars not only asked for more information regarding material terms, but also did not acknowledge and therefore could not accept the terms regarding the production of two sixty second radio commercials (Complaint, Ex. C).
In addition, Ms. Sellar's statement that she intended to provide a redline memorializing additional terms that were "very important" to Mr. Keitel does not demonstrate acceptance of the Term Sheet language (Complaint, Ex. I at ETRADE00002321). These additional requests and conditions are equivalent to a rejection or a counteroffer (Lamanna v Wing Yuen Realty, Inc., 283 AD2d 165 [1st Dept 2001]).
As to Mr. Keitel's waiver argument, the Court finds that E*Trade's conduct does not unmistakably manifest a willingness to waive the clear language of the Term Sheet (Ess & Vee Acoustical & Lathing Contractors, Inc. v Prato Verde, Inc., 268 AD2d 332, 332 [1st Dept 2000]).
Mr. Keitel has failed to establish that adding the terms "binding and final" and "Harvey Keitel Firm Offer" intentionally and voluntarily abandoned the writing requirement (Gen. Motors Acceptance Corp. v Clifton-Fine Cent. Sch. Dist., 85 NY2d 232, 236 [1995]).
The Court has evaluated Mr. Keitel's arguments that E*Trade's offering of a "kill fee" establishes the existence of a contract, and finds them to be unpersuasive. As E*Trade correctly asserts, evidence of an offer of "any valuable consideration in compromising or attempting to compromise a claim which is disputed as to...validity...is inadmissible as proof of liability" (CPLR 4547[a]). 
Accordingly, it is further
ORDERED that E*Trade's motion to dismiss is granted, and the Complaint is dismissed in its entirety, with prejudice, and the Clerk is directed to enter judgment accordingly.
Dated: April 17, 2017