Benjamin Wey, NYG CAPITAL, LLC, Plaintiff,

against
NASDAQ, Inc., THE NASDAQ STOCK MARKET LLC, ADENA FRIEDMAN, ROBERT GREIFELD, MICHAEL SPLINTER, NELSON GRIGGS, EDWARD KNIGHT, ARNOLD GOLUB, WILLIAM SLATTERY, MICHAEL EMEN, ALAN ROWLAND, KEELY MOXLEY, ROBERT McCOOEY, ANDREW HALL, Defendant.


651684/2018

Plaintiffs:
Jonathan Lupkin
Lupkin PLLC
80 Broad Street, Suite 1301 New York, NY 10004
646-367-2772
Defendants:
Matthew Benjamin, Douglas Cox and Amir Tayrani
Gibson Dunn & Krutcher LLP
200 Park Avenue, 47th Floor
New York NY 10016
212-351-4079


Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58, 59
were read on this motion to/for DISMISS.
Upon the foregoing documents and for the reasons set forth on the record (2/11/2020), although the court holds that the Plaintiffs' claims are not preempted by federal law (see Section II below) or that the defendants are entitled to immunity as to the Plaintiffs' claims (see Section III below), the defendants' motion to dismiss pursuant to CPLR 3211(a)(7) is granted and the Complaint is dismissed without prejudice.
THE RELEVANT FACTS AND CIRCUMSTANCES
Benjamin Wey, who was born in China in 1971, attended college in the US on scholarship earning his bachelor's degree in 1994, his Masters of Business Administration in 1999, became a naturalized citizen in 2001, and in 2013, was awarded his Master's Degree in Science from Columbia Business School, Columbia University. (Compl., ¶ 22). Mr. Wey has spent more than 20 years in the international business and consulting industry, developed expertise in finance from a cultural and business perspective both in the US and in China, and in or around, 2001, co-founded, and served as the Chief Executive Officer of, New York Global Group (NYG; NYG, together with Mr. Wey, collectively, hereinafter the Plaintiffs), a company that advises Chinese investors regarding high quality, profitable investment and financing opportunities in the international capital markets, including via listings on the NASDAQ Stock Market (hereinafter defined; Compl., ¶¶ 23 and 61). 
Although Mr. Wey has never been a member of NASDAQ Stock Market LLC (the NASDAQ Stock Market), a New York based registered securities exchange that "operates as an electronic stock market and offers securities listing, trading, and information products and services" (id., ¶¶ 25-26), which is owned and operated by NASDAQ, Inc. (NASDAQ), nor ever joined the management or board of any publicly-traded company, according to the Complaint, Mr. Wey allegedly was a "highly sought-after, high profile consultant" who introduced Chinese companies to leading American underwriters, investment banks, accountants, lawyers and other participants in the financial markets, including Barclays Capital, Deutsche Bank Securities, [*2]Goldman Sachs (Asia) HSBC Securities, Citigroup, JP Morgan, Bank of America, Merrill Lynch, UBS Credit Suisse, Wells Fargo Securities, Lazard, Morgan Stanley & Co. Inc., Oppenheimer & Co., Cowen and Company (Asia), BMO Capital Markets, William Blair & Company, "and others" (id., ¶ 62). These deals involved some of the largest and most powerful and sophisticated institutional investors, including Fidelity Investments, Janus Capital Group, The Carlyle Group, Oppenheimer Funds, Wellington Management, Apollo Management, BlackRock, Guardian Insurance, AIG Insurance, State Street Global, Loomis Sayles, Legg Mason, JPMorgan Asset Management, Deutsche Bank Asset Management, UBS Asset Management, Morgan Stanley, Credit Suisse Asset Management, Blackstone, Neuberger Berman, and others (id., ¶ 63). And, in order to facilitate his clients' efforts to list on the NASDAQ Stock Market, Mr. Wey developed and maintained relationships with Charlotte Croswell, President of NASDAQ International, Eric Landheer, NASDAQ'S Head of Asia Pacific, Yeeli Hua Zheng, NASDAQ's Chief Representative in China, Guan Xun Xu, NASDAQ's Chief Representative in Asia before Ms. Zheng, Robert McCooey, Jr., Senior Vice President of NASDAW's Listing Services unit, and Nelson Griggs, Senior Vice President of NASDAQ's New Listings and Capital Markets (id., ¶ 64). This was not a one-way relationship. For their part, and to further their alleged goal of recruiting Chinese companies to the NASDAQ Stock Market and to encourage listing on the NASDAQ Stock Market (i.e., and instead of the New York Stock Exchange (NYSE), the NASDAQ Stock Market's main competitor), these NASDAQ executives wooed Mr. Wey by visiting him in Beijing and New York and by playing golf and attending various marketing and social events with him (id., ¶¶ 65 and 66). For example, the Complaint asserts that in 2009, Mr. Xu arranged and led a NASDAQ delegation to Shenyang, China to participate in a NASDAQ listing ceremony for SmartHeat, Inc., one of Mr. Wey's clients, which raised more than $130 million and in which eventually a 13% interest was purchased by Fidelity Management (id.). By 2011, more than 200 China-based companies were listed on the NASDAQ Stock Market. According to the Complaint, this all changed abruptly when NASDAQ soured on newly listed Chinese companies.
As set forth in the Complaint, in the summer of 2010, the Securities and Exchange Commission (the SEC) launched an investigation into certain Chinese companies listed on the NASDAQ Stock Market, some of which were eventually accused of accounting fraud, along with several major auditing firms "with Chinese subsidiaries who had assisted these companies in the listing process" (id., ¶ 69). At or about the same time, several news organizations published investigations of these purported "Chinese scams," estimating that such fraudulent listings on NASDAQ Stock Market had resulted in tens of billions of dollars in losses borne by American investors (id., ¶¶ 69-70, 80-81). One of these articles, published in the financial publication Barron's, was entitled "Beware This Chinese Import" and specifically mentioned Mr. Wey, describing him as "one of the most controversial promoters of Chinese takeovers," and implying wrongdoing on his part (id., ¶ 81). According to the Plaintiffs, this Barron's article, its negative publicity and the SEC investigation, caused NASDAQ to look for "scapegoats." And, according to the Complaint, Mr. Wey became an easy target (id., 86). More specifically, the Complaint provides that with their "eyes focused firmly on deflecting blame onto Mr. Wey, NASDAQ's chosen scapegoat," between 2011 and 2017, the defendants allegedly made, caused to be made or acquiesced in making false statements to the SEC, the FBI and the United States Attorney's Office for the Southern District of New York accusing Mr. Wey of fraudulently [*3]assisting Chinese companies in maintaining their NASDAQ listings by "circumventing" NASDAQ's listing rule 5505(a)(3), the so-called "300 Round Lot Rule" (id., ¶¶ 98-99, 11). 
Under the 300 Round Lot Rule, companies that wish to list on the NASDAQ exchange must have no fewer than 300 shareholders holding a minimum of a "round lot," a position of 100 shares or more (id., ¶ 11). The defendants allegedly accused Mr. Wey of evading this rule by "arranging for shareholders to gift their own shares to friends, families, or business associates" (id., ¶ 99). Specifically, by way of example:
NASDAQ's most senior executives, including Adena Friedman, Robert Greifeld, Michael Splinter, William Slattery, Arnold Golub, Alan Rowland, Andrew Hall, Nelson Griggs, Robert McCooey, Jr., and Edward Knight, told (or acquiesced in subordinates telling) government officials the following falsehoods in relation to Mr. Wey, in furtherance of a plan to destroy NYG, Mr. Wey's business:
i. Mr. Wey devised a conspiracy and scheme to defraud NASDAQ through gifting shares to various people, including friends, employees, and business associates, to create the appearance of a bona fide shareholder base that satisfied the 300 Round Lot Rule.
ii.As part of this conspiracy, Mr. Wey, assisted by others, fraudulently maintained NASDAQ listings by artificially inflating the shareholder base of NYG Clients through these "stock giveaways," which created the illusion that these companies possessed the required shareholder base to satisfy the 300 Round Lot Rule.
iii.To mask the 300 Round Lot Rule violation, Mr. Wey caused misleading statements to be made regarding the gifting of shares and NYG Clients' satisfaction of the 300 Round Lot Rule.
iv.Mr. Wey caused previously gifted shares to be deposited into brokerage accounts (colloquially called "putting shares in street name") for the purposes of disguising the beneficial owners of gifted shares.
(Compl., ¶ 101).

The Plaintiffs allege that these statements were false in two respects: (1) "that the 300 Round Lot Rule contained no prohibition whatsoever regarding gifted shares being included in the minimum shareholder count," and (2) because Mr. Wey never actually made or caused others to make any fraudulent representations regarding the gifting of shares to friends, employees or business associates (id., ¶¶ 102, 105 [emphasis added]). Nevertheless, the Plaintiffs allege that as a result of the defendants' statements, on January 25, 2012, the FBI raided Mr. Wey's home and office for evidence of his wrongdoing, which raids exposed Mr. Wey and NYG to subsequent negative media coverage (id., ¶¶ 106-115).
In September of 2015, more than three years after the search of Mr. Wey's home and office, Mr. Wey was indicted for fraud and, two days after that, the SEC charged Mr. Wey with malfeasance in a civil enforcement proceeding (id., ¶¶ 116-117). Both actions were purportedly based upon "NASDAQ's fabricated rule violations and outright lies to federal authorities" (id., ¶ 118). 
In a decision and order, dated June 13, 2017, Judge Alison Nathan of the United States District Court For the Southern District of New York ruled that the FBI's search of Mr. Wey's home and office violated the Fourth Amendment of the United States Constitution and suppressed all evidence that the government seized pursuant to those searches (United States v Wey, 256 F Supp 3d 355 [SD NY 2017]). Following Judge Nathan's decision, both the US Attorney's Office and the SEC voluntarily dismissed their actions against Mr. Wey (Compl., ¶ 129). However, the Complaint alleges that NASDAQ's "smear campaign" left Mr. Wey's business in ruins and destroyed the Plaintiffs' lucrative business relationship with, among others, non-party NYGG Asia, a Chinese company not owned by Mr. Wey, with which the Plaintiffs used to collaborate to "identify and facilitate high quality investment and financing opportunities in the international markets for Chinese investors" (id., ¶¶ 42-43).
Mr. Wey and NYG sued NASDAQ, the NASDAQ Stock Market, and Adena Friedman, Robert Greifeld, Michael Splinter, Nelson Griggs, Edward Knight, Arnold Golub, William Slattery, Michael Emen, Alan Rowland, Keely Moxley, Robert McCooey, and Andrew Hall, asserting state law claims for: (1) malicious prosecution, (2) tortious interference with prospective economic advantage, and (3) tortious interference with contract based upon the defendants' allegedly wrongful cooperation with government officials in the investigation of Mr. Wey and his company, NYG, and seeking damages in excess of $200 million. 
The action was initially filed in the Commercial Division of New York Supreme Court on April 9, 2018. On April 18, 2019, the defendants removed the action to federal court arguing that the federal court had original and exclusive jurisdiction under 28 USC § 1331 and 15 USC § 78aa because the Complaint alleges violations of rules promulgated under the Securities Exchange Act of 1934 (the 34 Act) (15 USC § 78 et seq.). The Plaintiffs moved to remand and in a decision, dated March 25, 2019, Judge Keenan of the United States District Court for the Southern District of New York granted the motion. 
In his decision, Judge Keenan wrote that jurisdiction is governed by the well pleaded complaint rule which provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint" citing Caterpillar Inc. v Williams, 482 US 386, 392 (1987). Further, and relying on Gunn v. Minton, 568 US 251, 258 (2013) which applied the holding in Grable v & Sons Metal Prods., Inc. v Darue Eng'g & Mfg., 545 US 308, 314 (2005), Judge Keenan noted that where the complaint alleges only state law claims, federal jurisdiction may still based on the four Grable factors if a federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. Because Judge Keenan concluded that the defendants had failed to satisfy the first Grable factor, i.e., whether a federal issue was an "essential element" of the Plaintiff's claims, Judge Keenan remanded. 
[*4]DISCUSSION
The Complaint Fails to State a Claim
A party may move for judgment dismissing one or more causes of action on the ground that the pleadings fail to state a cause of action for which relief may be granted (CPLR § 3211 [a] [7]). On a motion to dismiss pursuant to CPLR § 3211 (a) (7), the court must afford the pleadings a liberal construction and accept the facts alleged in the complaint as true, according the plaintiff the benefit of every favorable inference (Morone v Morone, 50 NY2d 481, 484 [1980]). The court's inquiry on a motion to dismiss is whether the facts alleged fit within any cognizable legal theory (id.). Bare legal conclusions are not accorded favorable inferences, however, and need not be accepted as true (Biondi v Beekman Hill House Apt. Corp., 257 AD2d 76, 81 [1st Dept 1999]). Inasmuch as the Complaint fails to state a claim pursuant to which relief can be granted, dismissal is mandated.
Malicious Prosecution
"The elements of a claim for malicious prosecution are (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice" (Mendez v City of NY, 137 AD3d 468, 470 [1st Dept 2016]). Significantly, probable cause to believe that a crime has been committed is a complete defense to a cause of action for malicious prosecution (Batten v City of NY, 133 AD3d 803, 806 [2d Dept 2015]). Here, the Plaintiffs fail to adequately allege that the US Attorney lacked probable cause to obtain Mr. Wey's criminal indictment, putting aside any statements made to law enforcement by the defendants, and cannot establish that the criminal proceeding against Mr. Wey actually "terminated in his favor." Critically, the fact that the federal court suppressed the evidence seized pursuant to the search warrant does not, ipso facto, mean Mr. Wey was free of guilt. It solely means that the manner in which the evidence was obtained violated his Fourth Amendment rights and that the evidence obtained had to be suppressed as fruit of the poisonous tree of that illicit search. And, dismissal, under the circumstances, solely means that the government determined that it could not meet its burden of going forward, absent the suppressed evidence, i.e., and not that Mr. Wey was in any way exonerated (e.g., Martinez v City of Schenectady, 97 NY2d 78, 84 [2001] ["absence of a conviction is not itself a favorable termination"]). For the avoidance of doubt, the government stated as much when it voluntarily dismissed its case: the nolle prosequi entered in the criminal proceeding against Mr. Wey explains that the "Government sought charges in this matter based in significant part on materials seized" during the searches of Mr. Wey's home and office and that following the district court's grant of Mr. Wey's motion to suppress "the Government [could] no longer rely on that evidence at trial" and, therefore, chose not to proceed (Unites States v Wey, No. 1:15-cr-00611, D.E. 128, para 3-4 [SD NY Aug 8, 2007]). As such, the Complaint fails to state a claim for malicious prosecution.
Tortious Interference with Prospective Economic Advantage
To state a cause of action for tortious interference with prospective economic advantage, [*5]the Plaintiffs must allege that the defendants' conduct that purportedly interfered with the Plaintiffs' prospects was either undertaken for the sole purpose of harming the Plaintiffs or that such conduct was wrongful or improper independent of the interference allegedly caused thereby (Jacobs v Continuum Health Partners, Inc., 7 AD3d 312, 313 [1st Dept 2004]). Merely advancing one's own self-interest, as the Plaintiffs allege the defendants did here, is insufficient to establish a claim of tortious interference with prospective economic advantage (Phillips v Carter, 58 AD3d 528 [1st Dept 2009]; see also Burns Jackson Miller Summit & Spitzer v Linder, 59 NY2d 314 [1st Dept 1983] [claim fails where plaintiff failed to allege "defendants' sole motivation was 'disinterested malevolence'"]). Moreover, and significantly, the Plaintiffs do not properly allege that NASDAQ directly interfered with any prospective business relationship between the Plaintiffs and a third-party. All that the Plaintiffs offer is that it is "reasonable to infer" that NASDAQ acted "expressly to destroy Mr. Wey's business with NYGG Asia" based on allegations of NASDAQ's "knowledge" of a business relationship between the Plaintiffs and NYGG Asia, NASDAQ's "active relationships with both Plaintiffs and NYGG Asia," and NASDAQ's "underst[anding]" that the Plaintiffs' business relationship with NYGG Asia was important to the Plaintiffs' business (Ptf. Opp. Memo., p. 22). This is insufficient (see Carvel Corp. v Noonan, 3 NY3d 182 [2004]). Nor does Brook v Paconic Bay Med. Ctr. warrant a different result as Brook involved an alleged breach of a bargained for resignation in exchange for a promise by the employer that the employee would not be placed under investigation when the employer fraudulently told the employee that he was not under investigation while simultaneously reporting the employee to the authorities (152 AD3d 436 [1st Dept 2017]).
Tortious Interference with Contract
"Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third-party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom" (Lama Holding Co. v Smith Barney, 88 NY2d 413, 424 [1996]). Fatal to the Plaintiffs' claim is that none of the allegations suggest that the defendants targeted the Plaintiffs' relationship with NYGG Asia or that the defendants acted with the intent of impairing that contractual relationship. In addition, and importantly, the complaint contains no non-conclusory allegation that NYGG Asia breached a specific agreement with the Plaintiffs, only that it "ceased using Mr. Wey's consulting services" (Compl., ¶ 163). Even if the Court were to credit the Plaintiffs' lone, conclusory allegation that, "NYGG Asia breached its agreement with NYG," there is still no allegation that the defendants "intentionally procured" NYGG Asia's breach of contract with the Plaintiffs (Lama Holding Co., 88 NY2d at 425). At most, crediting all of the allegations in the Complaint and giving the Plaintiffs the benefit of every favorable inference, the Plaintiffs allege a claim of wrongful conduct by the defendants based on the defendants' desire to deflect blame and negative publicity away from NASDAQ by casting Mr. Wey as a scapegoat for the allegedly fraudulent listings on NASDAQ. This fails as a matter of law to make out a claim for tortious interference.
The Plaintiffs' Claims Are Not Preempted
NASDAQ Stock Market is a national securities exchange registered with the SEC (15 [*6]USC § 78f[a]) as well as a self-regulatory organization (SRO) under the 34 Act (15 USC §78[b][5]). All of NASDAQ's proposed rules must be submitted to the SEC for approval (id., § 78s[b]). SROs are required to comply with their own rules, the 34 Act, and all of the regulations promulgated under the 34 Act, and they must make sure that their members and persons affiliated with their members do so as well (id., § 78s[g][1]; DL Capital Group, LLC v NASDAQ Stock Market, Inc., 409 F3d 93, 95 [2d Cir 2005]). In the event that an SRO violates its own rules, the 34 Act, or the regulations thereunder, the SEC may take disciplinary action against the SRO (id., § 78s[h][1]). 
SROs like NASDAQ and NYSE serve as an aid to the SEC in implementing and effectuating compliance with the securities laws and "effectively stand in the shoes of the SEC because they perform regulatory functions that would otherwise be performed by the SEC" (DL Capital Group, supra, citing D'Alessio v New York Stock Exchange, Inc., 258 F 3d 93, 95 [quotation omitted]).
Whether federal law preempts state law is a question of "congressional intent" (Guice v Charles Schwab & Co., 89 NY2d 31, 39 [1996]). State law may be preempted when it conflicts with federal law or when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (id.). Congressional intent under the 34 Act was to preempt state law claims based on an SRO's duties under the Exchange Act (In re Series 7, 548 F3d 110, 113-114 [DC Cir 2008]). Instead of state-law liability, "Congress created a self-contained process to review and remedy such complaints" (id. at 114). Pursuant to Congress's regulatory scheme, the SEC must approve SRO rules and may unilaterally amend them (15 USC § 78s[b][1], [c]). In turn, an SRO must comply and enforce compliance with its own rules (id., § 78s[g][1]). If an SRO does not, the SEC may suspend its registration and/or "censure or impose limitations upon [its] activities, functions, and operations" (id., § 78s [h][1]). Congress also authorized any "person aggrieved" by an SEC order disciplining — or refusing to discipline — an SRO to "obtain review" directly in a federal court of appeals (id., § 78y [a][1]). Congress did not, however, authorize a private right of action under the 34 Act to challenge an SRO's failure to follow its own rules (Desiderio v NASD, 191 F3d 198, 207-08 [2d Cir 1999]). Thus, in short, "rather than allow[] plaintiffs to sue under common law theories, Congress created a self-contained process to review and remedy such complaints" (Series 7, 548 F3d at 114).
The defendants assert that each of the asserted causes of action rests on the allegation that NASDAQ failed to abide by its own listing standards embodied in its SEC-approved rules when it provided law enforcement with information about Mr. Wey's purported circumvention of the 300 Round Lot Rule through the gifting of shares (e.g., Compl., ¶ 103 ["NASDAQ executives fabricated the nonexistent NASDAQ rule violations and lied to the federal authorities"]) and argue that for the Plaintiffs' claims to proceed here would ultimately require a jury to decide whether NASDAQ properly interpreted and enforced compliance with its own listing requirements and whether NASDAQ properly exercised its "broad discretionary authority" to "apply additional or more stringent" listing criteria (NASDAQ Rule 5101) in refusing to allow the Plaintiffs to circumvent the 300 Round Lot Rule. Putting this to a jury and not the SEC, the defendants argue "would defeat Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets" (Lanier v Bats [*7]Exch., Inc., 838 F3d 139, 155 [2d Cir 2016]). This however misses the point. The gravamen of the Complaint is not that NASDAQ took regulatory action against the Plaintiffs. Rather, the allegation is that NASDAQ made allegedly false factual statements to the SEC and/or Federal Bureau of Investigations, which if true might have sustained administrative or criminal action by the SEC or Department of Justice. And, here all a jury need decide is whether (i) NASDAQ and its people said what the Plaintiffs say they said; and (ii) whether NASDAQ was negligent or reckless or intentional in making these alleged false factual statements about how the Plaintiffs allegedly did business. At best, NASDAQ's understanding of its rules may go to their intent—but the Plaintiffs need not show that they complied with the NASDAQ rules or that NASDAQ violated its own rules in what it said to the federal authorities. If NASDAQ was applying a factual standard to the Plaintiffs that it had not used in applying its rules to others, this would go to intent, and the credibility of NASDAQ and its witnesses in justifying their actions. Put another way, nothing in the present suit requires the Court to declare invalid the official act of NASDAQ (cf., W.S. Kirkpatrick & Co. v Environmental Tectonics, 493 US 400 [1990]). In other words, at this stage of the proceedings, the Plaintiffs' state law claims are not preempted.
The Plaintiffs' Claims are Not Barred by SRO Immunity
Although this is a much closer call, the Plaintiffs claims are also not barred by SRO immunity. As the party seeking immunity from liability for its actions, NASDAQ bears the burden of establishing that it is entitled to immunity from this suit (D'Alessio v New York Stock Exch., Inc., 258 F3d 93 [2d Cir 2001]). Immunity from suit is generally decided on a case by case basis, depending on the governmental function being performed (Barbara v New York Stock Exch., 99 F3d 49, 58 [2d Cir 1996]). It is well-settled that immunity doctrines extend to private actors when they perform governmental functions and, consistent with that approach, the courts have also recognized that the doctrine of absolute immunity from suit by private entities may extend to private entities — such as NASDAQ — engaged in quasi-public adjudicatory and prosecutorial duties (D'Alessio, 258 F3d at 105). 
In fact, as the Second Circuit has held, "absolute immunity is particularly appropriate in the unique context of the self-regulation of the national securities exchanges," which perform "a variety of regulatory functions that would, in other circumstances be performed" by the SEC pursuant to the broad authority delegated to SROs by the Exchange Act (Barbara, 99 F3d at 59; D'Alessio, 258 F3d at 105). In other words, NASDAQ, as an SRO, "stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with those laws" (D'Alessio, 258 F3d at 105). As such, it follows that it should be entitled to the same immunity as the SEC when it performs functions delegated to it under the SEC's broad oversight authority (id.; Sparta Surgical Corp. v NASD, 159 F3d 1213 [9th Cir 1998]). This is a matter not simply of logic, but also of "intense practicality, since, in the absence of such immunity, [NASDAQ's] exercise of its quasi-governmental functions would be unduly hampered by disruptive and recriminatory lawsuits" (D'Alessio v New York Stock Exch., 125 F Supp 2d 656 [SD NY 2000]). 
To determine if NASDAQ is entitled to absolute immunity from suit in this action, the Court must look not to the manner in which the Plaintiffs cast their claims, but rather to the [*8]alleged misconduct of the defendants as detailed in the Complaint (D'Alessio, 258 F3d at 105-106). Here, the defendants argue that although the Plaintiffs' claims are cast as state law claims, they are premised largely on the NASDAQ's purported misinterpretation of its 300 Round Lot Rule which 300 Round Lot Rule, like other NASDAQ rules and listing requirements, is established pursuant to SEC approval (see 15 USC § 78s[b]). Furthermore, the defendants argue, NASDAQ must comply and "enforce compliance" with its SEC-approved rules (15 USC § 78s[g][1]; § 78[b][1]), including NASDAQ Rule 5801, which obligates NASDAQ listing staff to investigate and enforce compliance with its listing standards. Here, in interpreting and enforcing its listing rules — including the referral of potential violations to law enforcement — and relying primarily on the Second Circuit's decision in D'Alessio v New York Stock Exch. (258 F3d 93), the defendants argue that NASDAQ was engaged in a regulatory function that is mandated by Congress and the SEC and its action is, thus, protected by absolute immunity from private suit (D'Alessio, 258 F3d at 104 ["'the interpretive and referral functions of [an SRO] are just as quasi-governmental as its disciplinary functions, and hence the same immunities attach'"]). The argument however fails.
In D'Alessio, a securities broker and his wholly owned corporation brought a state court action against the NYSE and its officials seeking damages for numerous alleged torts arising from the ban of plaintiffs from the NYSE floor. The case was removed to federal court and both the United States District Court For the Southern District of New York, and the Second Circuit held that the defendants were immune from common law claims alleging that the NYSE "incorrectly interpreted and applied" the 34 Act and various of its own rules and regulations, and "provided false information when it cooperated with and assisted the United States Attorney's Office and the SEC in their investigations" of the plaintiff (id. at 106). As the Second Circuit explained:
The source of the duty imposed on the NYSE (as well as other SROs) is found in federallaw; namely in the Exchange Act. Thus, it is the propriety of the NYSE's actions, as prescribed under federal law, that is at the heart if D'Alessio's allegations. Moreover, resolution of D'Alessio's claims necessarily requires an inquiry into whether NYSE satisfactorily performed its duty in identifying potential violations of the federal securities laws and assisting in any criminal or civil investigation arising from a member's noncompliance with those laws, both areas of strong federal interest.

 ***
The NYSE, as a SRO, stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with those laws. It follows that the NYSE should be entitled to the same immunity enjoyed by the SEC when it is performing functions delegated to it under the SEC's broad oversight authority.
(id. at 103 [emphasis added]).
The Second Circuit concluded that:
The NYSE's alleged improper interpretation of the type of conduct prohibited section 11(a) [of the Exchange Act] falls within the NYSE's "quasi-public adjudicatory" duties. Similarly, the NYSE acted in its adjudicatory capacity when it determined that D'Alessio was guilty of violating section 11(a) and various rules of the NYSE and suspended him from further [*9]trading on the NYSE floor. Because these actions "share the characteristics of the judicial process," the NYSE is entitled to immunity from suit for claims based on these actions. In charging D'Alessio with misconduct and referring his case to the United States Attorney's Office and the SEC, the NYSE exercised its authority pursuant to its "quasi-prosecutorial" function. Notwithstanding the distinct nature of these duties the misconduct that the NYSE allegedly engaged in share a common theme: they all relate to "proper functioning of the regulatory system." Accordingly, ... we hold that the NYSE, when acting in its capacity as a SRO, is entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder" (id. at 106 [citations omitted]).
D'Alessio does not apply to the allegations set forth in the Complaint in this case. NASDAQ did not ban Plaintiffs from being listed or from having shares traded. The Plaintiffs' allegations are that NASDAQ and its employees made alleged factual misstatements that were premised, in part, on their reading of their regulations which caused the Plaintiffs harm.
To be clear, relying primarily on the SEC's amicus curiae brief in City of Providence v Bats Global Markets, Inc., the Plaintiffs seek to distinguish D'Alessio on the basis that Mr. Wey is nota member of NASDAQ whereas the plaintiff in D'Alessio was a member of the NYSE, but this is not the critical distinction.
As an initial matter, and as the Plaintiffs concede in their opposition memorandum of law, courts have never suggested that the identity of the plaintiff is what drives the immunity analysis (Opp. Memo., p. 14). Indeed, regardless of member status, federal courts have long recognized that SROs are immune from claims concerning regulatory reports and internal investigations because such allegations necessarily concern the exchange's functions in their supervisory and oversight role (see In re NYSE Specialists Sec. Litig., 503 F3d 89, 96-97 [2d Cir 2007]). And, the distinction between members and nonmembers as the basis for immunity from suit is simply not supported by the case law. For example, in In DL Capital Group, LLC v NASDAQ Stock Market, Inc., a non-member investor filed suit against NASDAQ based on the timing of NASDAQ's public announcement that it was going to cancel certain trades of a listed company (409 F3d 93 [2d Cir 2005]). The Second Circuit concluded that NASDAQ was immune from suit because, "[w]ithout the capacity to make announcements, [SROs] would be stripped of a critical and necessary part of their regulatory powers ... namely, the power to inform the public of those actions it has undertaken in the interest of maintaining a fair and orderly market or protecting investors and the public interest" (id. at 98). In doing so, the court in DL Capital expressly rejected the argument made by the Plaintiffs here, that absolutely immunity only applies when an SRO is operating as a regulator of its members (id. at 99). As the court in DL Capital explained: the identity of the plaintiffs is not what drives the absolute immunity analysis (id.). Rather, "it is the SRO's function as a quasi-governmental authority that entitles it to absolute immunity." But the reasoning in DL Capital highlights the inapplicability of D'Alessio to the Plaintiffs' allegations. Put another way,the Plaintiffs allegations are that NASDAQ's conduct was outside of its regulatory function in that it singled Mr. Wey out and made false statements about him to the SEC and FBI which caused him injury. This conduct taken as true for the purposes of this motion is not subject to immunity.
[*10]City of Providence further illustrates the point. In City of Providence, a group of investors brought a putative securities fraud class action against national securities exchanges, including NASDAQ and NYSE (together with the other defendants in that case, the Exchanges), alleging that the Exchanges misled them about certain products and services that were sold to high-frequency trading (HFT) firms, which purportedly created a two-tiered system that favored the HFT firms (878 F3d 36 [2d Cir 2017]). The Exchanges argued that, among other things, they were absolutely immune from the claims asserted against them.
In its amicus brief to the Second Circuit, the SEC urged the court to adopt a narrow reading of SRO immunity that would be applicable to the exchanges, arguing that:

 Although exchanges have existed for more than two centuries in the United States, the doctrine of SRO immunity is a relatively recent development which arose in cases where SROs were acting in their prosecutorial and adjudicative capacities. It was first enunciated in Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc., 757 F.2d 676 (5th Cir. 1985), and embraced by this Court in Barbara v. New York Stock Exchange, Inc., 99 F.3d 49 (2d Cir. 1996). Both of those cases were lawsuits in which SRO members challenged disciplinary proceedings conducted by their SROs. This Court observed the longstanding common-law immunity enjoyed by judges and public prosecutors, and it reasoned that this immunity applies with equal force to "private entities engaged in quasi-public adjudicatory and prosecutorial duties" when they "conduct... disciplinary proceedings." Barbara, 99 F.3d at 58.
Such immunity makes sense for SROs for the same reasons it makes sense for judges and prosecutors: the prospect of "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties," and it would risk "the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Imbler v. Pachtman, 424 U.S. 409, 423 & n.20 (1976); see also Bradley v. Fisher, 80 U.S. 335, 347-48 (1872) (explaining absolute immunity as a "protection essential to judicial independence"); Butz, 438 U.S. at 513 (extending immunity to agency hearing examiners, who "share[] enough of the characteristics of the judicial process").
Accordingly, when an SRO conducts proceedings to discipline its members, investigates violations of securities laws or other rules of conduct, and performs other duties analogous to law-enforcement and adjudicatory functions, it remains squarely within the bounds of absolute immunity (SEC Amicus Br., 2016 WL 7030327, * 22-23).
The SEC went on to explain that although courts have expanded SRO immunity to include "certain actions that materially relate to member regulation," such expansion must be viewed in the context of those cases. To wit, the SEC wrote:

 At times this Court has used broad language that could arguably be construed to extend immunity beyond the core SRO function of member discipline and related efforts to regulate memberssuggesting, for example, that immunity applies when an SRO "perform[s] important governmental functions" or engages in activity that "relate[s] to the proper functioning of the regulatory system." NYSE Specialists, 503 F.3d at 96 (quoting Barbara, 99 F.3d at 58 and D'Alessio, 258 F.3d at 106). But this language must be read in the particular context of those cases, which, as explained above, all involved the "governmental function" of member [*11]regulation. Cf. Weissman, 500 F.3d at 1298 (rejecting NASDAQ's overly broad reading of D'Alessio's language).
(id. at *27).
The Second Circuit in City of Providence ultimately rejected the Exchanges' immunity defense, finding that immunity was not applicable to the facts of that case because the claims asserted did not involve any exchange conduct that could properly be characterized as regulatory as "the provision of co-location services and proprietary data feeds does not relate to the exchanges' regulatory function and [therefore] does not implicate the SROs' need for immunity" (878 F3d 36, 47). In other words, immunity makes sense to avoid "the prospect of harassment by unfounded litigation [that] would cause a deflection of the prosecutor's energies from his public duties, and it would risk the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust" (SEC Amicus Br., 2016 WL 7030327, *23 [quotation and citation omitted]). But there simply is no risk here because the Plaintiffs are not alleging that NASDAQ acted within its prosecutorial function as to either a member or a non-member for which immunity should apply. The Complaint alleges the opposite — i.e., that NASDAQ did not act within its regulatory function and singled Mr. Wey out and made false statements to the SEC and FBI about him which caused destruction to his business.
The defendants also argue that, to find that immunity did not apply, regardless of NASDAQ's purported economic self-interest, would have a chilling effect on an SRO's willingness to investigate fraudulent practices and to cooperate with law enforcement in such matters because if SROs were notshielded from the threat of litigation for malicious prosecution by immunity, they may well be reluctant to cooperate with and notify law enforcement of potential fraud on their exchanges. This argument also fails as the allegations are not merely that NASDAQ cooperated with law enforcement in the exercise of its regulatory or prosecutorial function but deliberate action on behalf of NASDAQ outside of the same. Accordingly, NASDAQ and its officers are simply not entitled to absolute immunity from the Plaintiffs' suit at this stage.
Conclusion
Because this Court holds that the Complaint fails to state a cause of action upon which relief can be granted, the Complaint is dismissed without prejudice, with costs and disbursements to defendants as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly in favor of the defendants.
2/11/2020